**UNITED STATES of America, Appellee,**

v.

**Ronnie BRYSER, Gerald DeGerolamo, Vincent DeGerolamo, Defendants–Appellants.**

**Nos. 89, 90 and 266, Dockets 91–1220, 91–1221, and 91–1336.**

United States Court of Appeals, Second Circuit.

Argued Aug. 26, 1991.

Decided Jan. 14, 1992.

Herald Price Fahringer, New York City (Diarmuid White, Lipsitz, Green, Fahringer, Roll, Schuller & James, of counsel), for defendants-appellants Gerald DeGerolamo and Vincent DeGerolamo.

Louis E. Fasulo, Brooklyn, N.Y., for defendant-appellant Bryser.

Anthony Siano, Asst. U.S. Atty., White Plains, N.Y. (Otto G. Obermaier, U.S. Atty., James B. Comey, New York City, of counsel), for appellee.

Before OAKES, Chief Judge, and FEINBERG and CARDAMONE, Circuit Judges.

OAKES, Chief Judge:

Defendants Ronnie Bryser, Vincent DeGerolamo, and Gerald DeGerolamo appeal from judgments of conviction entered on April 12, 1991 in the United States District Court for the Southern District of New York, Vincent L. Broderick, *Judge*, for conspiracy, 18 U.S.C. § 371 (1988), theft from an interstate shipment, 18 U.S.C. § 659 (1988), mail fraud, 18 U.S.C. § 1341 (1988), and wire fraud, 18 U.S.C. § 1343 (1988), following a nine-day jury trial.

Ronnie Bryser was sentenced to 120 months of imprisonment, Gerald DeGerolamo to 97 months, and Vincent DeGerolamo to 78 months. In addition, each defendant was sentenced to a three-year term of supervised release, a $10,000 fine, restitution

of $3,744,567.58, and special assessments totalling $850.

On appeal, defendants Gerald and Vincent DeGerolamo contend (1) that their convictions for violations of 18 U.S.C. § 659 cannot stand because their indictment failed to state a crime, (2) that the district court committed reversible error in failing to grant their request for a jury instruction concerning their alibi defense, and (3) that there was insufficient evidence to support their convictions for mail fraud, wire fraud, and conspiracy. All three defendants further contend that the district court erred by departing upwards five levels from the sentencing range provided by the Sentencing Guidelines for failure to return the stolen money.

For the reasons below, we affirm the convictions but vacate the sentences imposed and remand for resentencing before Judge Broderick.

### I. *BACKGROUND*

The seventeen-count indictment in this case arises from the defendants' November 12, 1989 theft of $3,744,567.58 in cash from the vault of Hercules Securities Unlimited, Inc. ("Hercules"), an armored car company they owned and operated.[1]

At trial, the government offered the following version of events. From July to November 1989, Ronnie Bryser, Vincent DeGerolamo, and Gerald DeGerolamo acquired two armored car companies for the purpose of stealing the monies entrusted to those firms by customers. In the summer of 1989, Bryser and Gerald DeGerolamo, with no prior experience in the armored car business, negotiated the first of these purchases, that of Titan Security Systems and Titan Courier Services (later renamed Hercules) in West Nyack, New York from James Peloso for $600,000. On the day of the closing, Gerald DeGerolamo provided Bryser with the down payment of $100,000 to pay Peloso in a plastic bag filled with bundles of cash wrapped in rubber bands. Peloso stayed on at Hercules, at Bryser's

---

1. The three defendants were charged with one count of conspiracy, one count of theft from an    interstate shipment, seven counts of mail fraud, and eight counts of wire fraud.

request, to teach him to operate the company and to introduce him to Titan's customers. Gerald DeGerolamo also provided cash each month to cover operating expenses.

Once in charge, Bryser had the door locks and the vault combination of the West Nyack facility changed and replaced the padlocks for the gates in the fence around the premises. At Gerald DeGerolamo's direction, Bryser gave the vault combination and new keys to Vincent DeGerolamo, who was subsequently seen opening locks, operating the alarm system, and opening the vault door.

In October 1989, Bryser reprogrammed the two Wells Fargo alarm systems covering the perimeter of the facility and the vault. Under the new program, Bryser was the "master" for the system, giving him the ability to program the alarm computer to accept other users. Bryser programmed the computer to accept Vincent DeGerolamo and James Peloso. Bryser also had one of his employees teach Vincent DeGerolamo to operate the alarm system and the vault combination system.

During the summer and fall of 1989, Bryser and Gerald DeGerolamo also acquired Armored Car Company of East Orange, New Jersey (East Orange) for $600,000. As part of the transaction, East Orange's owner insisted that the company's customers be sent certificates of insurance. Bryser sent the certificates out by mail and by facsimile wire transmission.

The defendants induced customers to deal with them by obtaining and using large theft insurance policies and by misrepresenting the identity, background, and experience of Hercules operators. For example, Bryser met with representatives from The Great Atlantic & Pacific Tea Company (A & P), one of East Orange's largest accounts. Bryser falsely represented that he had no partners and that he had wide experience in the business, thereby enabling him to retain A & P as a client and gain access to the cash receipts of 86 A & P stores.

To induce the insurance underwriters to issue the insurance policies, the defendants likewise made false statements about the operations of the companies. For example, in October 1989, Bryser falsely represented to his insurance agent, when asking for an additional $6 million of all-risk, transit insurance, that he was not going to hold large sums of cash at the West Nyack facility and that the amount of cash would stay well below the $1 million limit of the primary policy. Bryser indicated that the increased insurance coverage was only for marketing purposes.

In early November 1989, Hercules began experiencing financial pressures. A large client cancelled its account, the insurance company asked for an $8,350 premium payment for the all-risk transit insurance, and Peloso demanded payment of the unpaid balance from the Titan closing.

That same month, Bryser received a call from a loss control specialist working for the insurance underwriters requesting an examination of Bryser's operations. The visit was provoked by growing suspicions about Hercules. Soon thereafter, the defendants began their effort to steal customers' money from the Hercules vault.

On November 10, 11, and 12, 1989, Bryser caused vast sums of money to be loaded into the Hercules vault. Bryser ordered his drivers to take all the cash from East Orange to the Hercules vault in West Nyack for storage over the weekend, which amounted to more than $2.1 million. In addition, Hercules did not send all its trucks to make pickups from a toy store client, making it impossible to get almost $1.1 million of the client's cash to a bank that weekend. Instead, the money was taken to the Hercules vault. In total, over $3.7 million was loaded into the vault that weekend.

On Saturday morning, November 11, Gerald and Vincent DeGerolamo reprogrammed the alarm system so they would be able to arm and disarm the alarm system under Peloso's name. Later that afternoon, Gerald DeGerolamo asked Peloso what type of loss would involve the FBI in an investigation. Peloso told him that the loss of federal money sealed in blue plastic

Federal Reserve bank trays would bring the FBI into a loss investigation.

That evening and the following night, November 12, Gerald and Vincent DeGerolamo participated in and supervised the loading of the money into the Hercules vault. Shortly after 6:00 p.m. on Sunday evening, after the vault was fully loaded, the alarm system was armed, and all employees had left the Hercules facility, the alarm computer system recorded that the alarm systems for the premises and the vault were turned off. Less than an hour later, the systems were rearmed. The computer recorded that all actions were taken by "man number 10"—the number which was originally assigned to Peloso by Ronnie Bryser.

On Monday, November 13, after all attempts to open the vault using the combination failed, a representative of the vault installer began drilling through the vault wall. On the following day, when the drilling was complete, Hercules employees entered the vault and discovered that all but $190,000 of the cash stored over the weekend was missing. The cash that remained was sealed in the blue plastic Federal Reserve trays.

The defendants attempted to blame the former owner and operator of the business, Peloso, for the theft based on the fact that Peloso had an alarm access code and vault combination. To corroborate that theory, the defense also called a number of witnesses who testified that the DeGerolamos were in Rockaway at 7:35 p.m. on the night of the theft, approximately one half-hour after the robbery occurred. There was additional testimony that the drive from West Nyack to Rockaway takes at least one hour. Based on these facts, the defense argued that Vincent and Gerald DeGerolamo could not have carried out the theft.

The trial, which began on January 14, 1991, ended on January 28, 1991 when the jury found the defendants guilty on all counts. On April 12, 1991, Judge Broderick imposed sentences on the three defendants, who subsequently filed notices of appeal.

## II. *THE SUFFICIENCY OF THE INDICTMENT*

### A.

■ At the outset, appellants Vincent and Gerald DeGerolamo contend that their convictions on Count Two of the indictment, charging that the defendants stole $2.1 million of funds entrusted to East Orange by its customers from the Hercules vault in violation of 18 U.S.C. § 659 (1988), cannot stand because cash is not "goods" or "chattels" within the meaning of the statute.

The first paragraph of 18 U.S.C. § 659 provides in pertinent part:

> Whoever ... steals, or unlawfully takes, ... from any tank or storage facility, station, station house, platform or depot ... with intent to convert to his own use any *goods or chattels* moving as or which are a part of or which constitute an interstate shipment of freight, express, or other property [is guilty of a crime]. (emphasis added)

Appellants argue that Congress specifically excluded theft of money from this paragraph of 18 U.S.C. § 659 covering theft from interstate shipments because in a later paragraph, covering thefts from common carriers, Congress criminalized embezzling, stealing or taking of *"money, baggage, goods, or chattels."* 18 U.S.C. § 659 (1988) (emphasis added).[2] Appellants contend that, as a matter of pure statutory construction, if Congress intended to cover theft of money in the first paragraph of the statute, the statute would include the word, as it does in the fourth paragraph. *See*

---

**2.** The full text of 18 U.S.C. § 659's fourth paragraph provides:

Whoever embezzles, steals, or unlawfully takes by any fraudulent device, scheme, or game, from any railroad car, bus, vehicle, steamboat, vessel, or aircraft operated by any common carrier moving in interstate or foreign commerce or from any passenger thereon any money, baggage, goods, or chattels, or whoever, buys, receives, or has in his possession any such money, baggage, goods, or chattels, knowing the same to have been embezzled or stolen [is guilty of a crime].

*Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

This argument would be more persuasive if the first and fourth paragraph were enacted by the same Congress, but the fourth paragraph was added as an amendment in 1933 to the original text of the statute enacted in 1913. *See* Ch. 50, §§ 1, 2, 37 Stat. 670 (1913) (original text); Ch. 16, 47 Stat. 773–74 (1933) (amendment adding fourth paragraph). The legislative history of the 1933 amendment reveals that Congress did not rethink the language of the first paragraph when it wrote the fourth into the statute. Therefore, we believe that appellants cannot maintain their argument that Congress' failure to fix the first paragraph in 1933 to conform to the fourth represents a deliberate policy choice.

The 1933 amendment originated in the Senate as an effort to fill a gap in the coverage of then-existing state criminal laws which prevented prosecution of passenger train robbers and con artists because it was "impossible to determine in which State the offense was committed." 75 *Cong.Rec.* 13,821 (1932). The Senate never considered the language of the first paragraph during its deliberations on the bill; instead, it focused only on drafting problems internal to the 1933 amendment itself. *See id.* at 13,821–23.

After Senate passage on June 24, 1932, the bill was sent to the House of Representatives and referred to the House Judiciary Committee. The Committee reported the bill out favorably and in so doing gave the same gap-filling rationale for the amendment. The House report gives no indication that the first paragraph's language was reconsidered during the Committee's deliberations. *See* H.R.Rep. No. 1791, 72d Cong., 2d Sess. 1–2 (1932).

The bill first reached the House floor on December 19, 1932 but was set aside because of one Representative's concerns over the lack of a constitutional basis for the measure. The debate focused exclusively on this objection. *See* 76 Cong.Rec. 710 (1932). On January 16, 1933, the House recalled and ratified the amendment. The floor debate reiterated the amendment's previously expressed purpose and addressed some drafting problems particular to the amendment. Again, there is no evidence from the floor debate that Congress gave any consideration to the language in the first paragraph. *See* 76 Cong. Rec. 1897–99 (1933).

The legislative history of the 1933 amendment, therefore, fails to support appellants' argument that Congress reconsidered the first paragraph of § 659 after its original adoption in 1913. We simply have no basis for inferring that Congress deliberately excluded theft of money from the paragraph covering thefts from interstate shipments. *See United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.").

Appellants also argue that Congress reconsidered and preserved the original language of the first paragraph when the statute was later amended in 1946. *See* Act of July 24, 1946, ch. 606, 60 Stat. 656 (1946). We have long held, however, that the 1946 amendment made no "meaningful change ... which would alter the essential object of the statute or require any different construction than we have given it." *United States v. Padilla,* 374 F.2d 782, 785 (2d Cir.1967); *see also* S.Rep. No. 1632, 79th Cong., 2d Sess. 1–2 (1946) (explaining that the pending bill merely "clarifies and simplifies" existing language).[3]

**3.** Appellants also argue that use of the word "money" along with "goods" or "chattels" in other federal criminal statutes proves that Congress deliberately excluded the theft of money from interstate shipments from 18 U.S.C. § 659's coverage. *See, e.g.* 18 U.S.C. § 2314 (1988) (transportation of stolen goods). The 1913 Congress did not enact any of the statutes cited by appellants. Accordingly, we do not think these other enactments shed much light on the meaning of the 1913 statute.

We think appellants were properly charged under 18 U.S.C. § 659 for stealing millions in cash from the vault of an armored car business. This court has long interpreted § 659 as evincing Congress' intention to protect the integrity of interstate commerce and to prevent interference with the flow of that commerce. As we have previously explained:

[18 U.S.C. § 659] does much more than extend the crime of larceny to interstate or foreign shipments.

. . . . .

The essential object of this statute is to create, define, and punish the offense of abstracting or unlawfully having in possession goods while in interstate or foreign transit, and thereby interfering with interstate or foreign commerce.

*White v. United States*, 273 F. 517, 518 (2d Cir.1921); *see also United States v. Marrale*, 695 F.2d 658, 663–64 (2d Cir.1982), *cert. denied*, 460 U.S. 1041, 103 S.Ct. 1434, 1435, 75 L.Ed.2d 793 (1983).

In view of the purpose of the statute, we believe in this instance that the phrase "goods or chattels" includes money.[4] Here, the money was stored in large bundles and was not serving its usual function as a medium for exchange. As such, the money stolen by the appellants was indistinguishable from other kinds of property commonly stored for property owners.

Furthermore, if currency stored in bulk were exempted from the statute's cover-age, businesses transporting money in bulk as a commodity, such as armored car businesses, would be deprived of the statute's protection. This result would create significant disincentives for engaging in the business of transporting cash. Insurers might not want to insure such businesses against theft and owners might no longer wish to continue transporting money across state lines if theft of that money is no longer a federal crime.[5] Interstate commerce would clearly suffer in the absence of money transportation businesses. Such disruptions of interstate commerce are precisely what Congress sought to avoid in enacting the statute.

■ For these reasons, we hold that the phrase "goods or chattels" in the first paragraph of 18 U.S.C. § 659 covers the theft of cash from interstate shipments.[6]

### B.

■ Appellants Vincent and Gerald DeGerolamo next argue that their indictment failed to state a crime because the Hercules vault is not a "storage facility" within the meaning of 18 U.S.C. § 659. They contend that only a "storage facility" which is used in conjunction with a "station, station house, platform or depot"—the facilities that directly follow the phrase in the statute—are contemplated as within § 659's coverage. *See United States v. Manuszak*, 234 F.2d 421, 423 (3d Cir.1956).

4. We have implied such a conclusion in prior cases where we affirmed convictions under 18 U.S.C. § 659, on other grounds, that were predicated on the inclusion of money within § 659. *See Marrale, supra; United States v. Werner*, 620 F.2d 922 (2d Cir.1980).

5. The Government points out that no other federal criminal statute covers money stolen from interstate commerce. "As with other goods, money taken from an interstate shipment only falls within the reach of other stolen property statutes if it is transported across state lines *after* being stolen." *See also* 18 U.S.C. § 2314, 2315 (1988).

6. The only federal appeals court faced with a similar issue did not reach directly the issue whether money is covered by the phrase "goods or chattels." *United States v. Ingrao*, 844 F.2d 314, 316–17 (6th Cir.1988). The Sixth Circuit instead noted that it had affirmed earlier con-victions under § 659 for theft of money but assumed for the sake of argument that § 659 did not cover money. The court did, however, conclude that theft of food stamps would be covered. In language helpful for analyzing the issue at hand, Judge Guy reasoned that Congress used broad language in § 659 "to protect the free movement of goods in interstate commerce without reliance on narrow common law definitions." *Id.* at 317 (*quoting United States v. Shackelford*, 777 F.2d 1141 (6th Cir.1985), *cert. denied*, 476 U.S. 1119, 106 S.Ct. 1981, 90 L.Ed.2d 663 (1986)). He concluded: "Under defendant's analysis, the items of most obvious value and, thus, most likely to be the target of theft from an interstate shipment would be removed from the purview of the statute. Congress surely did not intend such a result." *Id.* (footnote omitted).

Because the Hercules vault was not associated with any "station, station house, platform or depot," they argue, § 659 does not cover the vault.

We have long disagreed with crabbed interpretations of this statute. *See United States v. Wora*, 246 F.2d 283, 286 (2d Cir. 1957). When interpreting § 659, "we must . . . be mindful that Congress has here undertaken to protect and promote the flow of goods in interstate commerce, and that this undertaking is not to be hampered by technical legal conceptions." *United States v. Berger*, 338 F.2d 485, 487 (2d Cir.1964), *cert. denied*, 380 U.S. 923, 85 S.Ct. 925, 13 L.Ed.2d 809 (1965).

Moreover, we do not think that coverage of the Hercules vault in any way strains the plain language of the statute. Section 659 protects four broad elements of interstate shipment from theft: (1) means of surface transportation ("any pipeline system, railroad car, wagon, motortruck, or other vehicle"; (2) support facilities for surface transportation ("any tank or storage facility, station, station house, platform or depot"); (3) means of interstate shipment over water and support facilities ("any steamboat, vessel, or wharf"); and (4) means of interstate air shipment and support facilities ("any aircraft, air terminal, airport, aircraft terminal or air navigation facility."). Viewed in this light, the Hercules vault falls easily within the second category because the vault is a support facility for shipment by "wagon, motortruck, or other vehicle"—here, armored cars transporting currency. *See Padilla*, 374 F.2d at 786 (explaining that Congress amended the statute in 1925 "so as to add motor vehicles and their transfer and storage facilities to the interstate transportation facilities enumerated from which the proscribed thefts or takings must occur.").

Accordingly, we believe Count Two of the indictment alleging that defendants "stole . . . from a storage facility, to wit, the vault of Hercules Securities Unlimited, Inc. . . . approximately . . . ($2,127,589.00) in United States currency" sufficiently states the crime of theft from an interstate shipment in 18 U.S.C. § 659.

### C.

■ Appellants next argue that the alleged original errors in the indictment were compounded when the district court constructively amended the indictment during the jury charge. Specifically, they contend that by substituting the term "property" in place of "goods or chattels" during the charge to the jury, the district court broadened the possible bases for conviction from those contained in the indictment.

■ The Fifth Amendment prohibits the trial of a "defendant . . . on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). A constructive amendment of an indictment occurs when "the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir.1988) (quoting *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir.1986)). Constructive amendments to an indictment are generally considered prejudicial *per se*, thereby requiring a new trial. *United States v. Weiss*, 752 F.2d 777, 787 (2d Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985).

We do not believe that the jury charge, when viewed in its entirety, modified the essential elements of a § 659 offense such that the appellants may have been convicted of a different offense than that charged in the indictment. *See United States v. Clark*, 765 F.2d 297, 303 (2d Cir.1985); *see also United States v. Colasurdo*, 453 F.2d 585, 590–91 (2d Cir.1971), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). When explaining the elements of the offense, the district court indicated that the government must establish beyond a reasonable doubt that "property was taken" rather than using the precise phrase "goods or chattels." However, immediately preceding that explanation, the district

court summarized Count Two of the indictment and used the words "goods and chattels" instead of "property" when explaining the charge against the defendants.[7]

Even if Judge Broderick had only explained to the jury that the theft of "property" was required for the offense, we fail to see how there was a substantial likelihood that the defendants could have been convicted of an offense other than 18 U.S.C. § 659. The jury heard no evidence regarding "property" stolen that was *not* part of an interstate shipment upon which they might have improperly based a conviction. To the contrary, the jury was only presented with evidence of the $3.74 million stolen from the Hercules vault on this charge. Accordingly, even if the district court's charge was slightly overbroad, there was no evidence presented of other "property" stolen upon which the jury could base a conviction for an offense that was not part of the grand jury indictment.

## III. *FAILURE TO GRANT AN ALIBI JURY INSTRUCTION*

■ At trial, the defense called several witnesses who testified that Vincent and Gerald DeGerolamo were in Rockaway at about 7:40 p.m. on the night of the Hercules theft, which occurred sometime between 6:11 p.m. and 7:02 p.m. There was further testimony establishing that it took at least one hour and nine minutes to drive from the West Nyack facility to Rockaway. After the district court called counsel to the side bar at the close of his charge, defense counsel requested for the first time that the court deliver an "alibi instruction" informing the jury that the government must disprove an alibi beyond a reasonable doubt.[8] The Government opposed the request and the district court decided

not to deliver the supplemental charge on alibi. Appellants Vincent and Gerald De-Gerolamo now contend that the district court's failure to so instruct was reversible error.

■ A defendant is entitled, upon proper request, to an instruction submitting to the jury any defense theory for which there is a foundation in the evidence. *See United States v. Pedroza*, 750 F.2d 187, 205 (2d Cir.1984). We have previously stated that, "[a]s a general rule, we think it best for [alibi] instructions to be given where alibi is claimed." *United States v. Burse*, 531 F.2d 1151, 1153 (2d Cir.1976). A proper alibi instruction informs the jury that, in order to gain an acquittal, the defendant need not *prove* an alibi defense but need only raise a reasonable doubt as to his or her presence at the scene of the crime. *Id.* The instruction prevents the jury from concluding that the failure to prove an alibi defense is a sign of the defendant's guilt. *Id.*

■ In this case, however, we agree with the government's contention that there was no basis for an alibi instruction because an alibi covering the time of the theft is no defense to crucial charges in the indictment. Specifically, the government did not have to prove that Vincent and Gerald DeGerolamo were present in the vault on the Sunday evening of the robbery in order for the jury to convict the defendants of *conspiring* to commit mail fraud, wire fraud, and theft from an interstate shipment. *See United States v. Guillette*, 547 F.2d 743, 752 (2d Cir.1976) (refusal to grant alibi instruction was harmless error because, among other reasons, "[t]he alibi, if believed by the jury, established no more

7. The following is Judge Broderick's complete summary of Count Two in his instruction to the jury: "On November 12 in the Southern District of New York the defendants unlawfully, willfully and knowingly, stowed, carried away, concealed and by fraud and deception obtained from a storage facility, the vault of Hercules, with intent to convert to their own use goods and chattels which were a part of and constituted an interstate shipment of freight, to wit, approximately $2,127,589."

8. The instruction requested by the defense is revealed in the following colloquy:

The Court: So tell me what you want me to charge the jury.
Defense Counsel: That the defendants have offered witnesses who state that they were not at the scene at the time the crime was committed. I believe it is the Government's duty, along with everything else to disprove an alibi beyond a reasonable doubt.

than that appellants did not participate in one of numerous overt acts of the conspiracy"), *cert. denied*, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977). Once a conspiracy is established, the liability of defendants extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy, such as the theft, mail fraud, and wire fraud. *See Pinkerton v. United States*, 328 U.S. 640, 646–48, 66 S.Ct. 1180, 1183–85, 90 L.Ed. 1489 (1946). Given the interrelationship of these charges, then, the district court could have misled the jury by submitting the requested instruction. The jury might have erroneously concluded that a failure to prove presence in the vault on the night of the theft beyond a reasonable doubt required an acquittal on all charges. *Guillette*, 547 F.2d at 752. Therefore, we believe the district court did not err in refusing to grant the supplemental instruction.

## IV. *SUFFICIENCY OF THE EVIDENCE*

■ Appellants Vincent and Gerald DeGerolamo also contend that the evidence was insufficient to support their convictions for conspiracy, mail fraud, and wire fraud.

However, "[t]he relevant question is not whether this court believes that the evidence at trial established guilt beyond a reasonable doubt.... Rather, an appellate court hearing a criminal case must uphold a conviction if *any* rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." *United States v. Brown*, 937 F.2d 32, 35 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 323, 116 L.Ed.2d 264 (1991); *see also Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In this analysis, the evidence must be viewed "in the light most favorable to the government." *United States v. Stanley*, 928 F.2d 575, 576 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). To that end, a reviewing court "must credit every inference that could have been drawn in the government's fa-

vor." *United States v. Macklin*, 927 F.2d 1272, 1277 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 146, 116 L.Ed.2d 112 (1991) (*quoting United States v. Villegas*, 899 F.2d 1324, 1339 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990)).

In *United States v. Finkelstein*, 526 F.2d 517, 526–27 (2d Cir.1975), *cert. denied*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976), we explained that a conviction for violating the mail fraud statute will be sustained if there is sufficient evidence from which the jury could infer that "a scheme or artifice to defraud existed, that the participants in the scheme caused the mails to be used in furtherance of that scheme, and that the defendant was a participant in the fraudulent scheme." Appellants Vincent and Gerald DeGerolamo contend that the government failed to offer sufficient evidence on the third prong of this test—that they knew of any scheme to defraud or were willing participants in any scheme.

We believe there was ample evidence to support their convictions. As the government showed at trial, the three defendants carried out a carefully orchestrated plan that involved: purchasing two armored car companies; defrauding customers into keeping their business with the new owners in part by mailing and faxing by wire certificates of insurance; defrauding insurers into providing coverage that would comfort nervous clients; filling the Hercules vault with massive amounts of cash; inquiring about when the FBI investigates losses from armored car companies; and carrying out the theft in a manner that would presumably avert an FBI inquiry and pin the blame on the prior owner and operator of the armored car businesses.

Given this evidence, a reasonable jury could conclude that the three defendants willingly participated in a scheme to defraud insurers and customers of Hercules which involved use of the mails and the wires. *See United States v. Davis*, 752 F.2d 963, 970 (5th Cir.1985) (government need not establish that defendant participated in all aspects of a scheme to prove

requisite participation for mail fraud conviction).

■ This same evidence of defendants' conduct from July 1989 through November 1989 provides a solid basis for inferring the existence of and participation in a conspiracy involving the three defendants. *See United States v. Young,* 745 F.2d 733, 762 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

## V. *UPWARD DEPARTURE FOR FAILURE TO RETURN STOLEN MONEY*

■ Ronnie Bryser, Vincent DeGerolamo, and Gerald DeGerolamo contend that the district court's decision to depart upward five levels from the sentencing range provided by the Sentencing Guidelines for refusing to return the $3.7 million stolen from the Hercules vault was erroneous.

A sentence is to be imposed within the applicable guidelines range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (1988 & Supp.1991); *see also,* United States Sentencing Commission, *Guidelines Manual,* § 5K2.0, p.s. (Nov. 1991).

Here, the district court found that the "Sentencing Commission in preparing the guidelines did not give adequate consideration to the situation where defendants having taken money still have that money and obviously plan to have recourse to that money upon their release from prison." On this basis, the district court made a five-level upward enhancement of defendants' base offense levels.

We think the district court properly concluded that the Guidelines do not adequately consider situations such as this where defendants refuse to return stolen money because they are willing to exchange time in prison for instant riches upon release. In so concluding, we agree with the Eleventh Circuit's analysis of this issue. *See*

*United States v. Valle,* 929 F.2d 629, 631 (11th Cir.) ("[T]he Guidelines do not contemplate a scenario such as this where the appellants expect to exploit the criminal justice system and enjoy the fruits of their crime following a relatively short period of incarceration."), *cert. denied,* — U.S. —, 112 S.Ct. 401, 116 L.Ed.2d 350 (1991).

Appellants contend that the Sentencing Commission considered the issue of encouraging the return of stolen property by allowing a sentencing judge to order restitution. U.S.S.G. § 5E1.1. We agree with the district court's conclusion, however, that the Commission did not give adequate consideration to the issue of encouraging the return of stolen property *before* a defendant serves his or her time in prison.

We see little incentive in the Guidelines for defendants to return the $3.7 million prior to their supervised release. If defendants returned the money prior to sentencing, a judge might decide to lower a defendant's sentence *within the applicable Guidelines range.* We find no provision, though, which would provide a reduction *in the offense level* for returning the money following an adjudication of guilt. *See, e.g.* U.S.S.G. § 3E1.1 comment (acceptance of responsibility reduction available for "voluntary payment of restitution *prior* to adjudication of guilt") (emphasis added). Therefore, we believe the district court properly concluded that the Sentencing Commission did not give adequate consideration to the issue of encouraging defendants to return stolen money prior to their release from prison.

■ Appellants further contend that the district court's upward departure violated their Fifth Amendment rights by penalizing them for refusing to incriminate themselves by returning the stolen money prior to resolution of their appeal. We disagree. The act of producing the money would not be incriminating because it would not implicate the defendants in any crimes other than those for which they have been convicted. *See generally Doe v. United States,* 487 U.S. 201, 206–214, 108 S.Ct. 2341, 2345–50, 101 L.Ed.2d 184 (1988) (discussing Fifth Amendment's applicabili-

ty to acts of production and suggesting that act of production which does not involve testimonial or communicative evidence is not privileged). Although they argue that the admission of guilt inherent in their production of the money would undermine their claim of innocence on appeal, production of the money would not be part of the appellate record and, accordingly, would be outside the scope of our review.

We note that this conclusion in no way undermines our holding in *United States v. Stratton*, 820 F.2d 562, 564–65 (2d Cir. 1987),[9] where we concluded that the enhancement of a sentence because the defendant refused to cooperate with the government by informing on other participants in a drug importation scheme was impermissible. In *Stratton*, it is possible that the defendant risked further incrimination by such cooperation. Defendants in the case at hand face no such potential adverse consequences from surrendering the stolen money. While we said that "[i]t is improper to increase a defendant's sentence due to his silence regardless of his motivations", *id.* at 565, we did so in the context of reference to cases involving failure to cooperate for fear of physical reprisal. Here, the "cooperation" involved is the return of stolen money. Thus we are in accord with the Eleventh Circuit, the only other court of appeals we know to have passed upon the propriety of such an upward departure, *United States v. Valle*, *supra*.

Ultimately, then, by allowing this upward departure for failure to return stolen money, we promote the purposes of "just punishment, respect for the law and adequate deterrence set forth in the Sentencing Reform Act." *United States v. Correa–Vargas*, 860 F.2d 35, 40 (2d Cir.1988); *see also* 18 U.S.C. § 3553(a)(2) (1988 & Supp.1991). As the district court correctly explained:

> If any precedent was permitted to exist under which defendants could exchange

a predictable time in prison for money, it would be an invitation to other people to commit crimes such as the one that these three defendants committed, to stash away the proceeds of the crime and then to have access to those proceeds once they leave prison.

We do not believe the jail cell should be a way station on the road to ill-gotten gains.

■ While we agree with the district court that, as a matter of law, an upward departure is permissible under the Guidelines and the relevant constitutional constraints, we do not believe that the district court made proper findings of fact on this disputed issue upon which to base the enhancement. *See Dunston v. United States*, 878 F.2d 648, 650 (2d Cir.1989); Fed.R.Crim.P. 32(c)(3)(D).

During sentencing, Judge Broderick indicated that he "had not received any evidence that this money had been dissipated", and later indicated that "[defendants] obviously have this money stashed someplace where they at least expect it is beyond the reach of the Government or those who were deprived of the money." While we suspect that Judge Broderick is correct in thinking that defendants indeed have control over the money, appellants should have the opportunity to present evidence indicating otherwise.

Accordingly, we remand for resentencing before Judge Broderick so that appellants can contest the trial court's assumption that defendants still possess the money stolen from the vault.

## VI. *CONCLUSION*

Having considered all of Vincent and Gerald DeGerolamo's arguments on these appeals with respect to their convictions and having found in them no basis for reversal, we affirm. We do, however, believe that the district court erred by not making sufficient factual findings upon which to base an upward adjustment in defendants' sentences. Accordingly, we

---

**9.** Stratton is, we note, consistent with the decisions in other circuits. *See, e.g. United States v.*

*Klotz*, 943 F.2d 707, 709–10 (7th Cir.1991).

vacate the three defendants' sentences and remand for resentencing before Judge Broderick.