**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3225
_____

UNITED STATES OF AMERICA

v.

ALEXANDER RODRIGUEZ,
a/k/a Alex

Alexander Rodriguez,
                                    Appellant


_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Crim. Action No. 1:13-cr-00428-001)
District Judge: Honorable Robert B. Kugler
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
October 27, 2017
_____

Before: GREENAWAY, JR., COWEN, *Circuit Judges*, and PADOVA, *District Judge*[*]

(Opinion Filed: March 14, 2018)
_____

_____

[*] The Honorable John R. Padova, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

PADOVA, *Senior District Judge*.

Alexander Rodriguez appeals his conviction, after a jury trial, of one count of conspiracy to distribute and possess with intent to distribute more than 500 grams of methamphetamine. He raises three claims of error. First, he argues that the District Court failed to properly instruct the jury with respect to the alibi defense he presented at trial. Second, he contends that the Government's proof at trial varied from the conspiracy charged in the Indictment, and thereby prejudiced Rodriguez's right to a fair trial. Finally, he maintains that one of the Government's expert witnesses introduced irrelevant and prejudicial testimony concerning the manufacture and effects of methamphetamine. Because we conclude, for the reasons set forth below, that none of these claims amount to plain error, we will affirm.

## I. Background

Because we write primarily for the benefit of the parties, we recite only those facts necessary to our analysis. Rodriguez was charged in a one count Indictment of conspiring from April 1 to April 28, 2012 to distribute, and possess with the intent to distribute, more than 500 grams of methamphetamine in violation of 21 U.S.C. § 846. On March 6, 2015, a jury convicted him of that count.

The charge arose from Rodriguez's participation in the sale of four pounds of

---

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

methamphetamine to a group of buyers, and his role in assisting the buyers to dilute the drugs for subsequent resale. The evidence admitted at trial established that Rodriguez arranged with his friend, David Santos, to supply methamphetamine to a group of three buyers: Kate Rodriguez, Joel Rodriguez, and David Crespo.[1] Rodriguez brokered a deal between the buyers and Santos, whereby Kate, Joel, and Crespo agreed to pay $100,000.00 in exchange for four pounds of methamphetamine. Santos acquired the drugs from a connection he had identified only as "Juko," and realized a $10,000.00 profit from the sale, half of which he gave to Rodriguez. The sale took place on the evening of April 17, 2012 at Santos's house; Rodriguez met with Kate and Joel beforehand, took them to Santos's house, and left with them after the deal was completed. Rodriguez also met with Joel for several hours the next day, April 18, 2012, to dilute one pound of the methamphetamine into five diluted pounds. Rodriguez took possession of the remaining undiluted methamphetamine, while Joel kept the five diluted pounds of drugs to take to Florida to sell with Kate.

Kate and Joel were ultimately arrested during the trip to Florida, and cooperated with the Drug Enforcement Administration ("DEA") in its investigation. The DEA executed a search warrant on the house next door to Santos's after Kate mistakenly identified it as the location where they had purchased the drugs, which prompted Santos to

---

[1] Appellant is not related to Kate Rodriguez or Joel Rodriguez. Thus, for the sake of clarity, and to match the procedure at trial, we refer to Kate and Joel by their first names and refer to Appellant by his last name.

3

warn Rodriguez of the law enforcement activity. Santos, Crespo, and Rodriguez were subsequently indicted for their roles in the conspiracy.

## II. Standard of Review

The District Court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction over Rodriguez's appeal pursuant to 28 U.S.C. § 1291. Rodriguez concedes that he did not preserve below any of the issues he now raises on appeal, and we consequently review his claims for plain error. Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 733-36 (1993). We have the discretion to correct an error not raised below

> only where the appellant demonstrates that (1) there is an "error"; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings"; and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

*United States v. Marcus*, 560 U.S. 258, 262 (2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)) (alteration in original) (additional citations omitted).

## III. Analysis

### A. The District Court's Alibi Instruction

The first issue Rodriguez raises on appeal concerns the instruction the District Court gave to the jury concerning his alibi defense. The proof at trial established that Rodriguez was present during two events relating to the conspiracy: first, the sale of the methamphetamine from Santos to Joel and Kate, which took place at Santos's house the

4

evening of April 17, 2012, and second, the meeting between Joel and Rodriguez on April 18, 2012, during which they diluted the methamphetamine purchased the previous day. Rodriguez presented two witnesses, his mother and the mother of his child, who each testified that he was with the two them at the Rodriguez family home from the evening of April 17 through approximately 2:00 p.m. on the afternoon of April 18, 2012. On the basis of this testimony, Rodriguez requested that the District Court give the jury an alibi instruction. The Government objected to the use of the Third Circuit Model Jury Instruction, arguing that it misstated the law when applied to a drug distribution conspiracy charge because the Government was not required to prove Rodriguez's presence at any particular place in order to establish the elements of conspiracy.[2] The District Court proposed an alternate instruction, noting its intention to omit any reference to any particular

---

[2] The Third Circuit Model Jury Instruction for an alibi defense states as follows:

> [Name] has raised a defense of alibi to Count[s] [Nos.] of the indictment, and you have heard evidence that [name] was not present at the time and place where the offense[s] charged is [are] alleged to have been committed. The government has the burden to prove beyond a reasonable doubt each of the elements of the offense[s], including that [name] was present at the time and place where the offense is alleged to have occurred. [Name] does not have to prove an alibi or that [he] [she] was not present.
>
> If, after considering all the evidence in this case regarding Count[s] [Nos.] of the indictment, you have a reasonable doubt about whether [name] was present at the time and place where the offense[s] charged was [were] committed, you must find [name] not guilty of that [those] offense[s].

*Third Circuit Crim. Jury Instructions*, § 8.02 (2009) [hereinafter, *Model Instructions*].

factual scenario and to permit the parties to argue the factual contours of the alibi to the jury. Rodriguez did not object to the proposed instruction. The District Court's entire instruction concerning the alibi defense was: "Alexander Rodriguez has raised a defense of alibi. The Government has the burden to prove beyond a reasonable doubt each of the elements of the offense. Alexander Rodriguez does not have to prove an alibi." App. at 1336.

Rodriguez argues on appeal that the District Court's alibi instruction was deficient because it did not specify, as the law requires, that the Government had the burden to prove beyond a reasonable doubt that Rodriguez's alibi was not true, and that Rodriguez needed only to raise a reasonable doubt about his presence at the scene of the offense to be entitled to an acquittal. He further argues that the District Court's deficient instruction made it "all but inevitable" that the jury was confused as to the burden of proof and was likely to have used any failure to prove his alibi as evidence of his guilt. Appellant's Br. 25. In this case, we conclude that the failure to use the language included in the model alibi instruction was not plain error.

Our precedent has long made clear that, where a defendant has raised an applicable defense of alibi, the "defendant is entitled to a specific instruction that '*on the issue of alibi*, the government ha[s] to convince the jury beyond a reasonable doubt that the alibi was not true.'" *United States v. Simon*, 995 F.2d 1236, 1243 (3d Cir. 1993) (quoting *United States v. Booz*, 451 F.2d 719, 723 (3d Cir. 1971)) (alteration in original) (additional citation omitted). This specific instruction is necessary "because 'the jury is likely to become

6

confused about the burden of proof when an appellant offers . . . [alibi] evidence.'" *Id.* (quoting *Booz*, 451 F.2d at 723). However, other circuits have noted that such an instruction may not be necessary when the defendant's presence at the scene of the crime is not a required element of the offense. *See United States v. Bryser*, 954 F.2d 79, 87 (2d Cir. 1992) (concluding that there "was no basis for an alibi instruction" where the prosecution did not have to prove the defendants' presence at the scene of the theft "in order for the jury to convict the defendants of *conspiring* to commit mail fraud, wire fraud, and theft from an interstate shipment" (citation omitted)); *United States v. Lee*, 483 F.2d 968, 970 (5th Cir. 1973) (holding that district court was not required to give an alibi instruction because "[t]he alibi, if believed by the jury, established no more than that [the defendant] was not present at the time that one or more of the conspirators performed an overt act in furtherance of the conspiracy"). The comments to the alibi defense model jury instruction in this circuit similarly acknowledge that a specific alibi instruction is not necessary "[f]or some offenses, such as conspiracy" because "there may not be a specific time and place when and where the offense was committed, and therefore the defense of alibi may be inapplicable." *Model Instructions* § 8.02 cmt. at 754.

Rodriguez argues that the District Court's alibi instruction was erroneous because it did not tell the jurors that the Government had the burden to prove that Rodriguez was present at the drug sale on April 17, 2012 and the meeting to dilute the methamphetamine

on April 18, 2012.[3]  We reject this argument because the Government was not required to prove Rodriguez's presence at either event in order to meet its burden of proof on the elements of the conspiracy with which he was charged.  In order to meet its burden of proof for the charged conspiracy, the Government needed to establish "(1) a shared unity of purpose between the alleged conspirators, (2) an intent to achieve a common goal, and (3) an agreement to work together toward that goal." *United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016) (citing *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999)).  Thus, the Government was not required to "prove the commission of any overt acts in furtherance of [a] conspiracy" to distribute drugs in violation of 21 U.S.C. § 846.  *United States v. Shabani*, 513 U.S. 10, 15 (1994) (citation omitted).  Because the Government was not required to prove that Rodriguez participated in any overt acts, his alibi, if believed by the jury, would only serve to demonstrate that he did not participate in the April 17, 2012 sale or the April 18, 2012 meeting to dilute the drugs, but would not entitle him to acquittal on the conspiracy charge.

Although a significant portion of the proof at trial focused on Rodriguez's presence

---

[3] Rodriguez also argues that the District Court's instruction was deficient because, in the absence of a specific instruction to the contrary, it "was all but inevitable" that "the jury would construe a failure of proof of the alibi by [Rodriguez] as evidence of his guilt." Appellant's Br. 25.  However, the District Court's alibi instruction made clear that "Rodriguez does not have to prove an alibi," App. at 1336, language which is effectively identical to the portion of the model instruction addressing the defendant's burden of proof. *See Model Instructions* § 8.02 ("[Name] does not have to prove an alibi or that [he] [she] was not present.").  We therefore conclude that the District Court's instruction was not erroneous insofar as Rodriguez maintains that it failed to instruct the jury that it could not construe any failure to prove his alibi as evidence of his guilt.

at and participation in the sale and later dilution of the methamphetamine, the Government also produced evidence of Rodriguez's involvement in the conspiracy beyond those events. This evidence included testimony by Santos and Kate that Rodriguez had communicated on multiple occasions with each of them to arrange the sale. The Government also produced evidence that Rodriguez was in regular cell phone contact with the other members of the conspiracy on the day of the sale, with the exception of an hour-long gap from 9:53 to 10:58 p.m. Finally, the Government also presented evidence that Rodriguez was involved with the conspiracy after April 18, 2012, including testimony by Santos that he met with Rodriguez to warn him after the DEA searched Santos's neighbor's house and evidence that Rodriguez called Joel and Kate twenty-two times in rapid succession the evening they were arrested with the drugs.

Given this other relevant evidence of Rodriguez's involvement in the conspiracy, it is clear that if it had given the model jury instruction for an alibi defense, "the district court could have misled the jury." *Bryser*, 954 F.2d at 88. The jurors might have erroneously believed that, if the Government failed to prove Rodriguez's presence at either the sale or the dilution meetings, they would be required to acquit on the charge of conspiracy, even if they believed all of the other evidence of Rodriguez's involvement. Accordingly, we reject Rodriguez's argument that the District Court erred by failing to give a jury instruction that would have placed a burden on the Government to prove his presence at the meetings on April 17 and 18, 2012 beyond a reasonable doubt.

9

**B. The Scope of the Conspiracy Proved at Trial**

In his second appellate issue, Rodriguez claims that the Government's trial evidence did not support the existence of the single conspiracy charged in the Indictment, but instead demonstrated that multiple, unrelated conspiracies existed, and, consequently, the evidence amounted to a variance from the Indictment. Rodriguez contends that this variance prejudiced his right to a fair trial because it created a risk that the jury's verdict was not unanimous insofar as the jurors may not have agreed on which of the unrelated conspiracies he joined.

The Indictment charged that Rodriguez, Crespo, Santos, and unnamed other individuals conspired to distribute and possess with the intent to distribute more than 500 grams of methamphetamine. Rodriguez argues that the evidence presented at trial showed that two distinct conspiracies existed: (1) a supplier conspiracy among Rodriguez, Santos, and Juko, the purpose of which was to sell methamphetamine to Kate, Joel, and Crespo; and (2) a separate diluting/reselling conspiracy among Joel, Kate, Crespo, and Rodriguez, the purpose of which was to dilute the methamphetamine and profit from the distribution of the diluted drugs to buyers in Florida.

"The 'variance doctrine is intended to prevent a situation in which the jury might be unable to separate offenders and offenses and easily could transfer the guilt from one alleged co-scheme[r] to another.'" *United States v. Greenidge*, 495 F.3d 85, 93 (3d Cir. 2007) (quoting *United States v. Barr*, 963 F.2d 641, 648 (3d Cir. 1992)). A variance exists "if the indictment charges a single conspiracy while the evidence presented at trial proves

only the existence of multiple conspiracies." *United States v. Kemp*, 500 F.3d 257, 287 (3d Cir. 2007) (citing *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989)). "We must determine 'whether there was sufficient evidence from which the jury could have concluded that the government proved the single conspiracy alleged in the indictment.'" *Id.* (quoting *Kelly*, 892 F.2d at 258). "We will sustain the jury's verdict if there is substantial evidence, viewed in the light most favorable to the Government, to support a finding of a single conspiracy." *United States v. Perez*, 280 F.3d 318, 345 (3d Cir. 2002) (citing *United States v. Smith*, 789 F.2d 196, 200 (3d Cir. 1986)).

In determining whether the evidence presented at trial establishes the existence of a single conspiracy or multiple independent conspiracies, we consider three factors: "(1) 'whether there was a common goal among the conspirators'; (2) 'whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators'; and (3) 'the extent to which the participants overlap in the various dealings.'" *Kemp*, 500 F.3d at 287 (quoting *Kelly*, 892 F.2d at 259). However, the absence of any one of these factors is not dispositive. *Greenidge*, 495 F.3d at 93 (quoting *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992)). Moreover, "[t]he Government need not prove that each [conspirator] knew all of the conspiracy's details, goals, or other participants" in order to demonstrate the existence of a single overall conspiracy. *Perez*, 280 F.3d at 343 (citing *United States v. Theodoropoulos*, 866 F.2d 587, 593 (3d Cir. 1989)). A defendant cannot demonstrate the existence of a variance merely by proving that a master conspiracy encompassed distinct sub-schemes; sub-schemes that

11

are related "in support of the overall illegal scheme" are not independent conspiracies. *Id.* at 346. Accordingly, proof of "interdependence [among coconspirators] serves as evidence of an agreement" that "helps establish whether the alleged coconspirators are all committed to the same set of objectives in a single conspiracy." *Kemp*, 500 F.3d 289 (internal quotations and citations omitted).

Rodriguez contends that the proof at trial indicated that there were two unrelated conspiracies that lacked a common goal: the conspiracy between Juko and Santos to distribute methamphetamine, and the conspiracy among Kate, Joel, and Crespo to dilute and resell the drugs in Florida. Rodriguez argues that, because the jury could have concluded that he joined either or both of these conspiracies, but the Indictment charged only one overall conspiracy, the proof at trial amounted to a variance from the Indictment. We disagree. Viewing the evidence in the light most favorable to the Government, we conclude that the evidence admitted at trial does not support the existence of two distinct conspiracies.

There was sufficient evidence for the jury to conclude that Rodriguez, Santos, Joel, Kate, and Crespo were all members of a single conspiracy because they shared a common goal and were dependent upon each other's continuous cooperation for the success of the undertaking. It is clear that the conspirators, including Rodriguez, had a common goal to conduct a transaction involving the sale of four pounds of methamphetamine from Santos to Joel, Kate, and Crespo. This was not a situation where the evidence at trial established two distinct groups, which operated without knowledge of each other, and which each had

12

dealings with Rodriguez.  Rather, Santos was aware before the transaction that Rodriguez was acting as a middleman, arranging for buyers of his product, and Kate was aware in advance that Rodriguez was arranging for the purchase of the methamphetamine from another individual.  It is also clear that the success of this venture was dependent upon the continuous cooperation of all the parties charged in the indictment: Santos only sought to obtain the drugs because Rodriguez knew that Kate, Joel, and Crespo were interested buyers, and the buyers' scheme to profit from the resale of the drugs could not have succeeded had Santos been unable to provide them.  This cooperation culminated in the sale Rodriguez orchestrated on the evening of April 17, 2012, when Joel and Kate, using money provided by Crespo, purchased the methamphetamine from Santos.

Rodriguez argues that Joel, Kate, and Crespo's purchase of the drugs from Santos does not amount to a drug distribution conspiracy because they were "mere buyer[s] whose limited dealings" with Santos were insufficient to make out a distribution conspiracy with Santos.  Appellant's Br. 33.  Rodriguez relies on the proposition that "simple buyer-seller relationship[s]," without more, are insufficient to amount to a conspiracy to distribute drugs.  *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999) (citations omitted); *see also United States v. Pressler*, 256 F.3d 144, 152-53 (3d Cir. 2001) (discussing *Gibbs*).  This proposition, however, is simply inapplicable to the instant appeal.  The evidence presented at trial established that the April 17, 2012 transaction was the result of extensive dealings among the parties that were conducted through Rodriguez.  Moreover, Rodriguez had a stake in both sides of the transaction, first splitting the proceeds of the sale with

Santos and then assisting Joel to dilute the methamphetamine for resale. Rodriguez's role as the orchestrator of and conduit between the parties to the transaction is sufficient to distinguish this case from that of a "simple buyer-seller" interaction. *Gibbs*, 190 F.3d at 197-98.

Even if we were to accept Rodriguez's assertion that there were two distinct schemes, namely, the supplying scheme between himself, Juko, and Santos and the reselling scheme between himself, Kate, Joel, and Crespo, we find that there is sufficient evidence for a reasonable jury to find that those schemes were interdependent, and consequently part of a single, larger conspiracy. The evidence demonstrated that Joel, Kate, and Crespo did not initially seek to deal in methamphetamine, and only undertook to buy, dilute, and attempt to resell it because Rodriguez told them that Santos could obtain methamphetamine. Similarly, the evidence showed that Santos acquired the methamphetamine specifically because Rodriguez told him he had people, Kate, Joel, and Crespo, "lined up" to buy it. App. at 514. In short, the participants all knew that others were also participants and that the success of each undertaking depended upon the willingness and agreement of the participants in the other. *See Kemp*, 500 F.3d at 289. Consequently, we conclude that there was substantial evidence to support the jury's finding of a single drug distribution conspiracy between Rodriguez, Santos, Crespo, and others. Accordingly, we reject Rodriguez's argument that there was a variance between the conspiracy charged in the Indictment and the proof of that conspiracy at trial. Consequently, we conclude that the District Court did not commit plain error in connection

14

with the evidence of the conspiracy admitted at trial.

## C. The Expert's Testimony

Finally, Rodriguez claims that the District Court erred by not excluding certain testimony by an expert witness for the Government concerning the manufacture and effects of methamphetamine because that testimony was irrelevant and prejudicial under Federal Rules of Evidence 401 and 404(b). At trial, the Government offered the testimony of DEA Special Agent Mark Wassmuth as an expert in the "manufacture, use, abuse and distribution of methamphetamine." App. at 100. In the course of his testimony, Agent Wassmuth testified about his experience with the manufacture of methamphetamine in labs and the dangers inherent in the creation of the drug. Agent Wassmuth also described his experience and opinions regarding the physical impact of methamphetamine on a user, the outward manifestations of such use, and the differences between the effects of methamphetamine and cocaine. Agent Wassmuth further testified about how and with what substances methamphetamine could be diluted by an inexperienced person. Rodriguez did not object at trial to Agent Wassmuth's qualifications or any of his testimony. However, he now contends that certain testimony concerning the dangers of

15

manufacturing[4] and consuming[5] methamphetamine should have been excluded at trial

---

[4] Rodriguez contends that the District Court should have excluded the following testimony concerning the manufacture of methamphetamine:

Q. With regard to the safety factor, have you, in your experience, on this clandestine lab enforcement scheme come upon labs that are, for lack of a better term, in crisis?
A. Some are – meaning that they may not be very sophisticated or –
Q. Well, no, in terms of it being volatile to the point of the lab itself being in a crisis mode?
A. Absolutely. There – sometimes you stumble on labs that are active labs. They're actively cooking, as we say. Some are not, not operational, whatsoever. Some are literally in a box on the floor. But they're all considered laboratories and they're all dangerous. But usually, when we enter a lab, we don't turn on lights, we don't turn on any switches. Nothing – do nothing that you would maybe normally do in a normal search warrant.
Q. Have you, in you experience, come upon any individual who is cooking apparently methamphetamine who has, as a result of error, caused himself to be in the process of being either harmed, consumed, et cetera?
A. Yes, I have. A few years ago in Somers Point, New Jersey, I got a phone call late one night. I responded to the scene and it was the result of what's known as a one-pot lab. A one-pot lab is fairly new. It's probably about five or six years old. This is a particular method of making methamphetamine using a one pot, a one bottle, usually one liter size plastic jugs and it's all cooked into, into one pot one – this one jug, but it's – the problem with it is that it's highly flammable, because it uses lithium metal mixed with water, which is flammable instantly.
Most of these people that do this procedure are very inexperienced. It can be found on the internet, very dangerous. The individual that did do this exploded in his kitchen, he caught fire and in the midst of him being on fire, he literally rushed outside to discard the contents left from it into the dumpster. He had third-degree burns, was in the hospital for a month for internal damage – internal injuries to his lungs.

App. at 96-98.

[5] Rodriguez further argues that the District Court should have excluded the following testimony concerning the effects of methamphetamine use:

16

Q. And as a result of [your past investigations], have you been able to, in addition to your training, determine how methamphetamine effects users?

A. Yes, absolutely.

Q. And in what regard?

A. The – the physical effects are very strange, in that the methamphetamine is not a natural substance. Cocaine comes from the coca plant, a natural substance. Methamphetamine is purely chemicals and it affects the body in such a way that's different than many other drugs. A lot of increased – because it's a central nervous system stimulant, it increases blood pressure, dilated pupils. There's instance, higher instance of acne and tooth decay. It affects the body in that way. It's general irritability, and you can't sleep, insomnia.

App. at 99.

Q. Okay. Have you seen the effects of methamphetamine on individuals that you would be either interviewed, arrested, been part of your investigations?

A. I have, yes.

Q. And could you tell us just briefly what you've observed with regard to that?

A. Some longer term meth users, long-term use of methamphetamine there's the experience that they have bugs under their skin and subsequently what happens is they start picking at their skin – they call them crank bugs. One of the terms for meth is crank. So they feel like they have this sensation of something crawling under their skin. So it creates open sores. They're generally not very interested in personal hygiene.
A tweaker is somebody that maybe would stay up for days and days and days. And 15 days is not really out of the norm for a heavy meth user. Tooth decay, because they're, again, not interested in any kind of hygiene, plus methamphetamine drys out your mouth and it promotes tooth decay. If you were to go on the internet and Google faces of meth, you would actually see – and Google meth mouth, it will talk about tooth decay. Oftentimes meth users, the only thing they are interested in is getting high again and looking where they're going to get meth again and personal hygiene goes out the window. So the only thing they are consuming, it's not healthy food, it's snacks and sweets and garbage food. And that doesn't help their body either.

17

because they were irrelevant and prejudicial.

Federal Rule of Evidence 702 controls the admission of testimony by expert witnesses, and provides in relevant part that an expert may offer testimony in the area of his or her expertise if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "The basic approach to opinions, lay and expert, in [the Federal Rules of Evidence] is to admit them when helpful to the trier of fact." *Perez*, 280 F.3d at 341 (quoting Fed. R. Evid. 704 advisory committee note). The question of whether expert testimony will be helpful to a jury is one of relevance, and is "evaluated under the standard expressed in [Federal] Rule [of Evidence] 401." *United States v. Ford*, 481 F.3d 215, 218

---

Q. With regard to a difference between methamphetamine and cocaine, in your experience, which high lasts longer, if you're able to determine that?

A. Methamphetamine, because it's so strong, because it's a different kind of stimulant, lasts anywhere from eight to 24 hours. It can last a long period of time. Cocaine, anywhere from 20 minutes, maybe up to two hours. It's a longer acting – or a quick acting substance. Methamphetamine is longer acting and it's longer acting if it's specifically injected or smoked.

App. at 104-05.

Q. And one final question. Earlier, you said that it can be abused and in your experience, how addictive is meth, as opposed to perhaps cocaine or heroin?

A. It is probably just as addictive, and every person is different, every individual is different to what their addiction levels may be. Some people maybe might not get addicted right away and some are more. But it is a highly addictive substance very similar to cocaine and heroin.

App. at 108.

(3d Cir. 2007) (citations omitted).  Accordingly, expert testimony is helpful to the jury if it has "any tendency to make a fact more or less probable than it would be without" the testimony and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.

Rodriguez argues that the District Court erred in allowing Agent Wassmuth to testify concerning the dangers associated with the manufacture of methamphetamine and its effects on users because neither the creation nor the use of methamphetamine was at issue in the case.  Rather, Rodriguez maintains, the only issues for the jury to decide were whether there was a conspiracy to distribute drugs and whether he had joined that conspiracy.  We agree that these areas of the expert's testimony were not helpful to the jury in resolving the issues at trial.[6]

We nevertheless conclude that the admission of this testimony did not amount to plain error because Rodriguez has not demonstrated that it affected his substantial rights. Rodriguez argues that this testimony was prejudicial because it amounted to an

---

[6] The Government argues that this was helpful to the jury for two reasons: first, Agent Wassmuth's account of searching methamphetamine labs was a part of his testimony regarding his expert qualifications, and that without this testimony he could not have been qualified as an expert; second, it argues that the opinions comparing the effects of methamphetamine to cocaine were relevant because Rodriguez made the nature of methamphetamine an issue in his opening statement.  We disagree.  First, an expert is not entitled to testify to irrelevant experiences in the course of providing a basis to be qualified as an expert because Rule 702 controls the scope of both his qualifications and his testimony to support his expertise.  Under the circumstances of this case, neither the expert's experience with nor his potential expertise in the dangers presented by the production of methamphetamine was helpful to the jury.  Second, comments made by Rodriguez's counsel in his opening statement that "[m]eth is a funny drug" and that one would have to be a chemist to either make or cut it did not make the addictive nature of methamphetamine or its physical effects on a user an issue at trial.  App. at 82-83.

inappropriate "back door" attack on his character, in violation of Federal Rule of Evidence 404(b). Appellant's Br. 44-45. However, Agent Wassmuth's testimony did not address Rodriguez's character as an individual. The expert testified about the production and effects of methamphetamine in general, but did not offer any testimony concerning Rodriguez or the particular drugs seized in his case. Moreover, the Government did not rely on the agent's improper testimony in its closing argument, nor did it encourage the jury to use the expert's testimony as a basis to impugn Rodriguez's character. We therefore reject this argument because Rodriguez has not established that the District Court's admission of these specific portions of the expert's testimony "affected the outcome of the district court proceedings," and accordingly has not established that the admission of that testimony was plain error that affected his substantial rights. *Marcus*, 560 U.S. at 262 (quotation omitted).

## IV. Conclusion

For the foregoing reasons, we conclude that Rodriguez has not met his burden to demonstrate that the District Court's alibi instruction amounted to plain error, that there was any variance between the conspiracy charged in the Indictment and the proof of that conspiracy at trial that amounted to plain error, or that the admission of the testimony of the Government's expert witness amounted to plain error. We will therefore affirm the District Court's judgment of conviction.