UNITED STATES of America, Appellee,

v.

Martyn C. MERRITT, Defendant–Appellant.

No. 986, Docket 91–1637.

United States Court of Appeals,
Second Circuit.

Argued May 22, 1992.

Decided Feb. 9, 1993.

Joel B. Rudin, New York City, for defendant-appellant.

Baruch Weiss, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., and Miguel A. Estrada, Asst. U.S. Atty., of counsel), for appellee.

Before: ELLSWORTH A. VAN GRAAFEILAND, AMALYA L. KEARSE, Circuit Judges, and PIERRE N. LEVAL, District Judge.*

LEVAL, District Judge:

Defendant Martyn C. Merritt appeals from a judgment of conviction and sentence entered on October 10, 1991 in the United States District Court for the Southern District of New York, John S. Martin, Jr., Judge, on his plea of guilty to the charge of conspiracy to defraud the United States, 18 U.S.C. § 371. Merritt was sentenced to the statutory maximum of 60 months imprisonment, three years of supervised release, restitution of $936,000, the maximum fine of double the loss ($1,872,000), and a special assessment of $50. In imposing sentence, Judge Martin departed upward from the guideline range, in part because Merritt fraudulently schemed to retain the proceeds of his fraud.

On appeal, Merritt contends that (1) the upward departure was unlawful; (2) the district court impermissibly punished Merritt for relying on his fifth amendment rights in refusing to disgorge the proceeds of the fraud or explain how the funds had been dissipated; (3) the Government violated its plea agreement with Merritt by advocating upward departure.

We affirm.

## I. *Background*

### A. The Offense

The twelve-count indictment arose from a scheme by Merritt and AMG Services, Inc. to defraud the United States Agency for International Development (AID) in connection with a foreign-aid contract to supply and ship high-quality powdered milk to the Democratic Republic of the Sudan, which was facing a serious food shortage. Instead of shipping the powdered milk, Merritt shipped a compound known as "milk replacer," which is not fit for human consumption and is commonly used as animal feed.

In 1985, AID had agreed to provide $71 million in grant aid to the Sudan. The Sudanese government, acting through the Arab Company for Agricultural Production and Processing (ACAPP), allocated approximately $1.25 million of the AID money for the procurement of powdered milk. ACAPP solicited bids for several hundred tons of high-quality, nonfat powdered milk. ACAPP selected Laura Exports USA, a

---

* Hon. Pierre N. Leval, District Judge, United States District Court for the Southern District of New York, sitting by designation.

New Jersey corporation, to supply 501 tons of milk powder produced in the United States, for approximately $936,000. In July 1988, ACAPP and AID arranged for payment of United States funds to Citibank, upon Laura's delivery to Citibank of proper certification that a supply of milk from the United States had been loaded freight prepaid on an approved vessel for delivery to the Sudan. Laura, however, was unable to find milk at the appropriate price, quality, and quantity in the United States, and, with the permission of ACAPP and AID, modified the agreement to permit shipment of the milk from Sri Lanka.

In December 1988 and January 1989, Laura assigned its rights and obligations under the contract to Merritt's company, AMG Services, Inc., a New York-based shipping and freight-handling company. Under the arrangement, AMG would supply and ship the milk and would receive the funds held by Citibank, net of a small commission for Laura.

On January 10, 1989, Merritt and AMG made a contract to purchase 501 tons of milk powder from a Netherlands corporation, Traco, CV, for $666,330. On January 18, 1989, Merritt caused the presentation to Citibank of a fraudulent bill of lading that falsely stated that 501 metric tons of milk had been loaded onto the Dutch ship "Tanya P" in Port Columbo, Sri Lanka. On the basis of the false bill of lading, Citibank released the $936,870 payment for the milk. Merritt received the money on January 23, 1989. In fact, he had neither located, nor even acquired, the milk.

Merritt told the probation officer preparing his presentence report:

> I knew that the Citibank letter of credit required the milk powder to come from Sri Lanka. In fact, I knew that the milk powder was not on board any vessel at that time, and I knew that it would not at any time be loaded in Sri Lanka.

Weeks later, Merritt acquired, purchased, and shipped "milk powder replacer" (not milk powder) from the Netherlands, (not from Sri Lanka). Milk replacer is normally used as animal feed, has a foul taste and odor, and is not fit for human consumption.

Although Merritt claimed to his probation officer that he was not the instigator of the substitution of animal feed, the Government's evidence showed that he was well aware of it. On March 2, 1989, Merritt sent a fax transmission to a co-conspirator in Sri Lanka stating:

> I don't want to alarm you but it looks like Traco has actually shipped *Animal Feed* and not Milk Powder
>
> . . . .
>
> Please keep this confidential but we don't want to get the blame if some one claim's [sic] later it was the wrong product.

(Emphasis in original.) The next day Merritt sent another fax to the same co-conspirator stating:

> 1. There are many kinds of milk powder and what Traco is doing is quoting you for milk powder for human consumption but they are actually supplying another type of product that is similar but not for human consumption. This other product (replacer) is a *lot* less than the milk powder for human consumption.
>
> 2. We can get any of these products and suggest you get the quotes from Traco and then when you *have* the order let us know *all* the details and we can purchase from actual suppliers at a much lower cost. Of course if we too quote for milk powder and actually supply "replacer" the savings is big!

In Merritt's plea agreement and allocution he acknowledged awareness, prior to shipment, that animal feed not fit for human consumption would be shipped. In March 1989, ACAPP had begun making inquiries about the whereabouts of the shipment. Merritt sent ACAPP a telex designed to conceal the fraud and to lull ACAPP into believing it soon would receive the powdered milk. Merritt stated in the telex that the milk had been shipped from Sri Lanka months earlier (as represented in the false bill of lading), but that the ship

had been temporarily rerouted to the Netherlands for repairs.

When the milk replacer reached the Sudan on April 6, 1989, ACAPP found that the milk was being held at the dock because the shipper and supplier claimed that they had not been paid. Merritt then sent ACAPP a series of telexes, again designed to conceal the fraud and to lull ACAPP into thinking it could and would soon get the milk released, and that any delay in the release of the milk was not Merritt's fault.

## B. The Plea Agreement

Merritt was charged in a twelve count indictment, alleging one count of conspiracy, 18 U.S.C. § 371, one count of defrauding the United States, 18 U.S.C. § 1031, one count of submitting a false claim to the United States, 18 U.S.C. § 287, and nine counts of wire fraud, 18 U.S.C. § 1343. On May 31, 1991, Merritt entered into a plea agreement with the government. Under the agreement, Merritt pled guilty to count one, which charged him with a conspiracy to submit false claims to the United States, to defraud the United States in connection with a contract worth in excess of $1 million, and to commit wire fraud. The court carried a maximum sentence of five years' imprisonment, a maximum fine of the greater of $250,000, or double the gross gain or gross loss, a $50 special assessment, $1,250,000 in restitution to the United States government and three years' supervised release.

In the agreement, the parties stipulated to the following facts and Sentencing Guidelines analysis:

a. Although the conspiracy count charges that the offense did not end until May 22, 1990, all the overt acts took place prior to November 1989 and consequently the relevant Guidelines are those that were in effect prior to the November 1989 amendments.

b. Because the offense is one of fraud and deceit, the base offense level is 6, pursuant to § 2F1.1(a).

c. Because the loss to the United States exceeded $1,000,000, the base offense level should be increased by 9 points, pursuant to § 2F1.1(b)(1)(J).

d. Because the offense involved more than minimal planning, the offense level should be increased by another 2 points, pursuant to § 2F1.1(b)(2). This upward adjustment also subsumes any upward adjustment that might be appropriate for Mr. Merritt's role as an organizer, leader, manager or supervisor under § 3B1.1.

e. Neither party will seek a departure from the Guidelines.

Thus, the stipulated base offense level was 17. The parties also stipulated:

It is understood that the sentence to be imposed upon Mr. Merritt is within the sole discretion of the sentencing Judge. [The United States Attorney's] Office cannot and does not make any promise or representation as to what sentence Mr. Merritt will receive.

Merritt agreed

to allocute that he believed, prior to shipping the milk product to the Sudan, that the product was animal feed not fit for human consumption, and knew that the contract required the supply of 1% low-fat milk fit for human consumption.

Merritt also agreed to allocute that he knowingly submitted a false bill of lading. Finally, Merritt agreed to make available, prior to sentencing, "all personal and corporate financial information requested by the Government." The Government agreed not to object to dismissal of the remaining counts against Merritt and all counts against AMG Services.

The parties did not agree on whether adjustments were appropriate for acceptance of responsibility or obstruction of justice. Merritt argued that because he was entering a plea of guilty, he was entitled to a two point reduction for acceptance of responsibility under § 3E1.1. The Government, however, stated:

[T]he Government is of the view that because of what it considers Mr. Merritt's obstructive conduct after he supplied the low quality milk powder, there should be no reduction of two points for acceptance of responsibility, or, alternatively, that any downward adjustment

for acceptance of responsibility should be offset by a corresponding upward adjustment for obstruction pursuant to § 3C1.1, and that consequently the appropriate offense level should be 17. *In arguing for an offense level of 17 as opposed to 15, the Government is free to raise all arguments which, in its view, indicate an absence of acceptance of responsibility, and, in addition, to raise all arguments which support its contention that the defendant engaged in obstruction pursuant to § 3C1.1.*

(Emphasis added.) The parties agreed that [i]n the event the Probation Department or the Court contemplates any Guidelines Adjustments, enhancements or calculations not referred to above, the parties reserve the right to make all appropriate arguments concerning such calculations, so long as such arguments are consistent with the terms of this agreement, including the understanding that the offense level range is 15 to 17.

## C. The Plea Allocution and Evidentiary Hearing

Merritt violated his promise under the plea agreement to make available prior to sentencing all personal and corporate financial information requested by the Government. During his plea allocution, Merritt stated falsely that of the $936,000 he received, all but approximately $75,000 was disbursed to other parties. Merritt submitted a forged document purporting to be an acknowledgement by the supplier of payment. The supplier later submitted an affidavit asserting that it had never received payment and had never seen or sent the document Merritt submitted. Merritt also sent a letter to a witness in Europe seeking confirmation of the supplier's payment, on stationery that appeared to be from a government agency

Merritt told the probation officer that the house at 87 Broadview Ave., New Rochelle, in which he had lived, had been owned by an entity in which he claimed he had no financial interest, the Broadview Development Corporation. The probation officer noted that despite the alleged sale to Broadview, Merritt continued to deduct property taxes and mortgage interest on the property in 1989 (when he purportedly no longer owned the house).

In a submission in anticipation of sentencing, the Government advised the court that after his guilty plea, Merritt had continued to claim he paid Traco with the crime proceeds; Traco denied receiving any payment. Merritt supplied no records documenting any payment to Traco. The Government also submitted additional documents showing that Merritt had misrepresented his interest in the Broadview house. The Government concluded its sentencing memorandum with the statement that Merritt "should be found to have engaged in obstructive conduct and sentenced in accordance with the plea agreement under Guideline Level 17."

At a conference on August 16, 1991, Judge Martin stated:

there is an effort being made to secrete assets so that restitution cannot be made. It has been my experience that generally defendants who pleaded guilty and were going to find themselves before a court for sentencing would do everything in their power to see that what they had done was right. I do not find this here. I am particularly concerned, ... because I think Mr. Merritt is trying to deceive the court....

Judge Martin then scheduled a hearing regarding the ownership of Broadview Development Corporation and the distribution of the proceeds of the fraud. As to the gross receipts from the fraud, Judge Martin stated: "It was in his hands. He had control over it. Absent some showing as to where that money went, my view is he is responsible." Judge Martin explained:

... the burden is on Mr. Merritt to establish that those funds went somewhere other than to his use.

. . . . .

[O]nce the Government puts the money in Mr. Merritt's hands and shows what analysis of his accounts demonstrates, then the burden is on him to prove that that money went for the purposes that he said it did

....

Judge Martin also advised that an upward departure for harm to the public health may be appropriate, as the fraud involved Merritt's provision of "material unfit for human consumption" to a "nutrition program." Judge Martin advised the defendant that he was considering an upward departure up to the statutory maximum of five years. Judge Martin stated:

> One of the reasons I want to put this off as long as I am putting it off is because I want Mr. Merritt to understand that ... if there is an opportunity to get this money back, I want it back, and he will be given credit for it; but if I find as a matter of fact that there has been an effort on Mr. Merritt's behalf to secrete funds, he should understand he is getting the maximum that I can possibly impose.

At an extensive hearing on September 26, 1991, the Government presented to the court a collection of documents regarding the distribution of the proceeds of Merritt's fraud and the proceeds of the sale of Merritt's house. The Government submitted an affidavit of a Mr. van der Beld, a Traco employee responsible for this transaction, and a computer printout from Merritt's business showing that Merritt had not paid Traco for the purchase of the milk replacer.

The Government also presented a bank statement from Chemical Bank stating that AMG Services' account had been credited for payment of $936,870 from Citibank; a letter from Mrs. Merritt directing Chemical Bank to transfer $900,000 of that amount to an account held by Xanthus Corporation, at Exchange National Bank of Chicago; and a bank statement showing that the $900,000 was in fact deposited on January 24, 1989. The Government showed that the Merritts were the authorized signators for the Xanthus accounts. On behalf of Xanthus, the Exchange National Bank purchased $900,000 in commercial paper. The money was then split into two different pots—one of approximately $670,000, the other of approximately $230,000. The sum of $230,000 was deposited into a Xanthus account at Exchange National Bank. Sub-

sequently, about $670,000 was deposited into a Xanthus account at Exchange National Bank and was then transferred to an account at Banque Worms in London. The parties disputed who controlled the Banque Worms account.

In addition, the Government presented evidence that Merritt lied to the probation officer about Broadview Development Corporation, and that the corporation was a nominee for Merritt (its records were signed by his wife and mother-in-law.) After purportedly selling the house to the corporation in 1982, the Merritts continued to live there until 1990, when, soon after the investigation began, Broadview sold the property. The Government showed that Merritt concealed at least $271,664 of the sale proceeds by transferring the money to a bank account in the Isle of Jersey.

Judge Martin stated that there were "other questions as to whether or not it is a ground for upward departure, that in this situation, where money is being provided in order to provide foodstuffs to human beings living in Sudan, the court should depart upward because the product that was supplied was not fit for human consumption and, therefore, the people in that country were deprived. It was not that they were poisoned, it was that they were deprived of food that they needed."

At the end of the hearing, Judge Martin reiterated to Merritt that he was considering an upward departure and offered Merritt the opportunity to withdraw his plea. Merritt declined to withdraw the plea.

**D. Judge Martin's Findings of Fact & Conclusions of Law**

On October 8, 1991, Judge Martin issued preliminary findings of fact and conclusions of law 792 F.Supp. 206. First, he found that the Government had not violated the plea agreement by participating in the hearing at the court's direction. He noted that the plea agreement specifically recognized that the Government would be free to submit all evidence and arguments indicating an absence of acceptance of responsibility and obstruction of justice by the defendant. Judge Martin reasoned:

Nothing could be more relevant on the issue of acceptance of responsibility than evidence that the defendant was attempting to secrete assets necessary to make restitution of the amount he received by fraud.

Judge Martin made several other findings: that Merritt "engaged in obstruction of justice when he submitted a false document to the Government, to wit, the alleged fax confirming that Traco had been paid for the replacer, and when he attempted to obtain by use of the Maritime Service Bureau letter a false statement that the payment had been made"; that Merritt continued to control $670,000 of the proceeds, which he was attempting to hide to avoid being compelled to pay restitution; that Merritt "deliberately attempted to mislead the Probation Department concerning Broadview and provided false and fraudulent information to the Probation Department concerning his financial condition by not reflecting the proceeds that Broadview received from the sale of the house."

The court held that a two point increase for obstruction of justice would be warranted on the ground that Merritt's false claim that Traco had been paid was an attempt to obstruct the Government's investigation. The court held that Merritt should be denied a two point reduction for acceptance of responsibility on two grounds: First, that Merritt falsely stated to the court that he had not retained the $936,000 proceeds; and second, that Merritt continued to insist that the fraudulent document he submitted (the alleged van der Beld letter) was genuine.

Judge Martin concluded that an upward departure may be warranted because several factors are present in this case " 'of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.' " Manual, § 5K2.0 (Policy Statement) (quoting 18 U.S.C. § 3553(b)). Judge Martin stated three concerns: (1) the extent of Merritt's obstruction of justice; (2) damage to the public welfare and serious disruption of a governmental function; and (3) engaging in a continuing fraudulent scheme to profit from his crime and retaining the proceeds of his crime. Judge Martin noted that these were not binding conclusions, but were provided to counsel for both sides in anticipation of the sentencing proceedings on October 10.

On October 10, Judge Martin held an additional evidentiary hearing and heard argument regarding upward departure. Judge Martin emphasized that Merritt's obstruction of justice had continued well after his plea of guilty. Judge Martin noted that Merritt had defrauded AID and participated in a conspiracy to deliver "goods not fit for human consumption pursuant to a program to supply foodstuffs, needed foodstuffs, to the Sudan." Judge Martin also suggested that the court would be willing to delay sentencing for four months to provide Merritt with the opportunity to return the proceeds. The defendant declined.

Judge Martin held that the appropriate offense level was 16.[1] He made an upward adjustment of two points for Merritt's obstruction of justice. Judge Martin departed upward one point for danger to public health (§ 5K2.14) (Policy Statement) and disruption of a governmental function (§ 5K2.7) (Policy Statement). Finally, pursuant to § 5K2.0, he departed upward from the offense level of 19 (30 to 37 months) to the statutory maximum of 60 months imprisonment because of Merritt's continued fraudulent scheme to retain the proceeds of his crime.

## II. Discussion

### A. Lawfulness of Upward Departure

Merritt contends that the district court had no authority to depart upward from the Guideline sentencing range by reason of Merritt's failure to pay restitution and concealment of assets. Merritt relies on the fundamental statutory command of Section 3553(b) that "[t]he court shall impose a sentence of the kind, and within the

---

**1.** The government conceded that the loss to the United States had not exceeded $1 million, so that Merritt's base offense level was appropriately adjusted downward one point from 17, pursuant to the fraud guideline, § 2F1.1(b)(1).

range, ... [set forth in the guidelines] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). Merritt argues that failure to make restitution and concealment of assets have been adequately considered by the Commission because they are mentioned and assigned potential consequences in several rules and comments relating to fraud, restitution, and fines. He contends that because the Manual adequately considers these issues, they cannot be used to justify departure.

Although we accept Merritt's general approach to the question, we reject the conclusion he suggests. It depends on a far too narrow concept of the appropriate role of departure. A close examination of the authorizing statute, the guideline texts, and their inter-relationship, shows that exercise of the departure power, in appropriate circumstances, is an essential ingredient of the sentencing system. We agree with the defendant that the crucial inquiry is whether the factor assertedly justifying departure was "an aggravating or mitigating circumstance of a kind, or to a degree," not adequately taken into consideration by the Sentencing Commission. The first focus of inquiry is then to determine exactly what was it that led Judge Martin to depart, and then to consider how such aggravating circumstances are treated in the Manual in order to determine whether they were "of a kind, or to a degree" adequately considered by the Commission.

The considerations that motivated the upward departure were as follows: The defendant, having obtained nearly $1 million through a fraud scheme, concealed the large proceeds through a series of disguised international corporate and bank transactions; even after his guilty plea, the defendant engaged in an elaborate scheme, which included falsely claiming to have paid for the merchandise, fraudulently concealing his ownership of real property, and falsely claiming to be no longer in possession of the benefits of the fraud, with the result that, after service of a modest period of imprisonment, he would enjoy the remainder of his life cushioned by the concealed million dollar fraud proceeds. Thus, the aggravating factor was not merely that the defendant had not paid restitution—a circumstance that can apply to a defendant who, in spite of good intentions, is incapable of doing so, nor merely that the defendant had concealed assets to make himself appear less wealthy. This defendant had devised an elaborate fraudulent scheme designed to protect him from fines, restitution orders, and civil suits as well, so as to secure ultimately the full benefit of his crime. Thus, the factors motivating Judge Martin included the defendant's continuing dishonesty and greed, and his cynical determination to profit from his crime after service of his jail time.

We turn to explore whether such aggravating circumstances can be the basis of departure.

### 1. *The Statutory Framework*

A recent thoughtful article by Professor Daniel J. Freed of the Yale Law School stresses the importance of analyzing the Guidelines in light of the statutory scheme of the Sentencing Reform Act, which established the framework for the Guidelines.[2] *See* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 Yale L.J. 1681, 1700, 1730–31 (1992). In the Sentencing Reform Act, Congress insisted that the character of the defendant be a significant factor in the determination of the appropriate sentence. *See United States v. Rodriguez*, 724 F.Supp. 1118 (S.D.N.Y.1989).

The keystone section in the creation of the new sentencing system is 18 U.S.C. § 3553. Subparagraph (a) instructs the sentencing court as to the "[f]actors to be considered in imposing sentence." Most prominently listed in clause (1) are "the

---

**2.** Sentencing Reform Act of 1984, Pub.L. No. 98–473, 98 Stat. 1987 (1984) (codified as amended at 18 U.S.C. §§ 3551–3559, 3561–3566, 3571–3574, 3581–3586 & 28 U.S.C. §§ 991–998).

nature and circumstances of the offense *and the history and characteristics of the defendant."* (Emphasis added.) Clause (2) insists on the "need for the sentence imposed" to be "just," and to "protect the public from further crimes of the defendant"—strongly implying a need to treat defendants differently depending on their perceived likelihood of recidivism. Clause (4), referring to the mandatory consideration of the "guidelines that are issued by the Sentencing Commission," specifies that the types of sentences and ranges will be "established for the applicable category of offense *committed by the applicable category of defendant."* 18 U.S.C. § 3553(a)(1), (2), (4) (emphasis added).

The importance of the character of the defendant is similarly emphasized in the provisions of the Sentencing Reform Act that established the Sentencing Commission. In defining the duty of the Commission, Congress provided that the Guidelines shall establish a sentencing range "for each category of offense *involving each category of defendant."* 28 U.S.C. § 994(b)(1) (emphasis added). And Sections 994(c) and (d) instruct the Commission how to proceed in "establishing categories of offenses" and in "establishing categories of defendants." 28 U.S.C. §§ 994(c) and (d). Congress directed the Commission to ensure that the Guidelines were drafted in conformity with the Congressionally-enumerated goals of sentencing. *See* 28 U.S.C. § 994(a) (Commission shall promulgate Guidelines "consistent with all pertinent provisions of this title [28] and title 18"); 28 U.S.C. § 994(f) (Guidelines "shall promote the purposes set forth in section 991(b)(1)...."); 28 U.S.C. § 994(g) (Guidelines "to meet the purposes of sentencing as set forth in section 3553(a)(2) of title 18....").

Thus, contrary to widely held belief, the Sentencing Reform Act did not abolish consideration of the character of the defendant in sentencing. In fact, through the provisions noted above, the Act clearly ordered

that the characteristics of the defendant were to be a central consideration in the fashioning of a just sentence.

It is widely, but incorrectly believed that the Act sought to avoid all sentence disparities among defendants with similar records who have been found guilty of similar conduct. What Congress sought to eliminate was *"unwarranted* sentence disparities."* 18 U.S.C. § 3553(a)(6) (emphasis added). Disparities resulting from important character differences are not only *warranted,* but clearly envisioned by the provisions of the Act.[3] *See* 28 U.S.C. § 991(b)(1)(B) (Guidelines were designed to assist Courts in "avoiding *unwarranted* sentencing disparities ... while maintaining *sufficient flexibility* to permit *individualized sentences* when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices....") (emphasis added); *see also* Freed, *supra,* at 1705.

### 2. The Guidelines

The next inquiry is to determine, with particular reference to the considerations that led Judge Martin to depart upward, how the Guidelines have carried out the statutory mandate described above.

It is particularly instructive to observe the manner in which the Commission carried out the Congressional command to devise a sentencing scheme driven jointly by appraisal of the nature of the offense and of the nature of the defendant.

Chapter 2, creating categories of offense conduct, consumes over 200 pages of elaborate tables, specifying basic conduct values, with innumerable upward and downward adjustments, depending on the refinements of the details of the criminal conduct. This chapter issues several hundred commands assigning numerical value to the various aspects of the criminal conduct.

The contrast between this highly detailed categorization of offense conduct and the

---

**3.** The Senate Report to the Sentencing Act states that the purpose of the Guidelines "is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, not to eliminate the thoughtful imposition of individualized sentences...." S.Rep. No. 225, 98th Cong., 2d Sess. 52, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3235.

treatment of the character of the defendant could scarcely be more marked. For, as to defendant characteristics, the Guidelines contain virtually no categorizing instructions. Explicit guideline commands are limited to those in Chapter 4, relating to the defendant's history of criminal convictions—approximately 20 commands assigning criminal history points or supplemental offense levels by reason of prior convictions. In addition, the Manual specifies (albeit in Policy Statements) that race, sex, national origin, creed, religion, and socioeconomic status are "not relevant" and that "drug dependance or alcohol abuse is not a reason for imposing a sentence below the guidelines." §§ 5H1.10 (Policy Statement) and 5H1.4 (Policy Statement). Otherwise, the Manual contains no categorizing command or classification pertaining to the character of the defendant.[4] As to all other aspects of a defendant's character, the Commission chose to proceed *through commentary*, directed to the courts' exercise of discretion. This guidance is given in Policy Statements, Application Notes, Commentary, and the broad discussion of departure that is set forth in the Introduction to the Manual.

For example, in Part 5H, as to age, education and vocational skills, mental and emotional condition, physical condition, employment record, and community and family ties and responsibilities, the Manual's guidance is limited to Policy Statements to the effect that these considerations "are not *ordinarily* relevant in determining whether a sentence should be outside the

Guidelines." (Emphasis added.) No mention whatever is made of personal characteristics like kindness or cruelty, generosity or greed, candor or dishonesty, forthrightness or manipulativeness.

■ These Policy Statements are of vastly different effect from a Guideline. In the first place, Policy Statements are merely hortatory or explanatory, rather than imperative. *See United States v. Johnson*, 964 F.2d 124, 127 (2d Cir.1992). Policy Statements are not subject to formal legislative review and are not promulgated in compliance with the provisions of the Administrative Procedure Act, and, accordingly, they do not have the same degree of lawful authority as a Guideline. *See id.; see also* Freed, *supra*, at 1695 & 1732.[5] Second, unlike the Policy Statements on race or religion, for example, those noted above on age, education, family responsibilities, etc., do not assert categorically that the specified factors are "not relevant." The Manual does not assign them a zero value. These Policy Statements rather assert that such factors "*ordinarily*" are not "relevant in determining whether a sentence should be outside the Guidelines." (Emphasis added.) This formulation carries the necessary inference that in cases falling outside the "ordinary," such factors may be considered as a basis for departure from the Guideline range.

This inference is strongly supported by other provisions of the Manual, starting with the basic Application Instructions of

---

**4.** One category only, criminal livelihood under § 4B1.3, turns on the court's finding as to the defendant's "pattern" of criminal conduct, rather than on convictions. But as this section provides only for an increase to Level 13, it is of no consequence except for defendants whose crime of conviction is among the least serious.

**5.** *Williams v. United States*, —— U.S. ——, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992), is not to the contrary. The district court had been influenced in its upward departure by an *incorrect* interpretation of a policy statement allowing departure if the criminal history category inadequately reflects the defendant's past criminal conduct. Manual, § 4A1.3 (Policy Statement). (The district court had relied on a provision of the policy statement allowing the district court

to consider "prior similar adult criminal conduct not resulting in a criminal conviction," § 4A1.3(e), but had failed to determine that the information regarding such conduct was "reliable," as the policy statement required.)

The Supreme Court held that it is error to *misinterpret* a policy statement that the court relies on in its sentencing determination. Although there is some discussion in both the majority and the dissent about the distinctions and similarities between policy statements and guidelines, nothing in the case turns on these issues. The majority's ruling that it is error to be influenced in sentencing by a *misreading* of a policy statement in no way implies that policy statements have the same force as guidelines. *See Johnson*, 964 F.2d at 127; *see also* Freed, *supra*, at 1731 n. 255.

§ 1B1.1. This section lists nine essential steps for the court to follow in imposing sentence. The final step is to consider offender characteristics, together with all pertinent policy statements and commentary, to determine whether departure is warranted. Section 1B1.4, furthermore, underlines that in considering "whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." [6]

Finally, in the discussion of Departures in Part 4(b) of the Introduction, the Commission asserts that courts should treat each guideline as "carving out a 'heartland,' a set of typical cases" and that, "[w]hen a court finds an atypical case," that "significantly differs from the norm, the court may consider whether a departure is warranted." *See, e.g., United States v. Rogers,* 972 F.2d 489, 493 (2d Cir.1992). This discussion goes on to assert that (apart from a few enumerated factors that may not serve as a ground for departure), "the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the Guidelines, that could constitute grounds for departure in an unusual case." Manual, Ch. 1, Pt. A, intro. comment 4(b) (Policy Statement). By way of explanation of the need for departures, the Commission stresses the difficulty of prescribing "a single set of guidelines that encompass the vast range of human conduct potentially relevant to a sentencing decision." *Id.*

To be sure, the ensuing discussion makes clear that the Commission expects the departure power to be sparingly used, and reserved for unusual cases. At the same time, however, the overall treatment makes clear that departure in the appropriate case is essential to the satisfactory functioning of the sentencing system. *See* Freed, *supra,* at 1694.

Thus, the nearly total absence of categorization of offender characteristics to be found in the Guidelines does not mean that the Commission sought to overrule or disregard Congress' instruction that offender characteristics should play a role of major significance in the determination of sentence. It is highly doubtful whether the Commission would have the authority to disregard a so clearly uttered statutory command.[7] Rather, the absence of Guideline commands for defendant characteristics represents the Commission's wise judgment that it is far more difficult to quantify the effect that such characteristics should have on individual sentences, than it is to prescribe relative values to a variety of offenses. The Commission thus decided (i) that only in circumstances that are other than "ordinary" should such values affect the sentence, but (ii) that in such cases, the degree of impact on the sentence should be governed by reasonable discretionary departure, rather than by prescribed imperative Guideline calculations.

This court has increasingly recognized the importance of departure by reason of offender characteristics for the fair fulfillment of the sentencing scheme prescribed by the Sentencing Reform Act and the Sentencing Guidelines. For example, during the last year alone, we have asserted the appropriateness of departure by reason of extraordinary family circumstances, *United States v. Johnson,* 964 F.2d 124, 128 (2d Cir.1992); *United States v. Califano,* 978 F.2d 65 (2d Cir.1992) (per curiam), defendant's unusual efforts at drug rehabilitation, *United States v. Maier,* 975 F.2d 944, 948 (2d Cir.1992); *United States v. Cotto,* 979 F.2d 921 (2d Cir.1992), previous convictions for aggravated felonies; *United States v. Campbell,* 967 F.2d 20, 24 (2d Cir.1992), voluntary surrender and extraor-

---

6. This application principle is compelled by 18 U.S.C. § 3661, which states: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

7. *See, e.g., Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

dinary acceptance of responsibility, *United States v. Rogers*, 972 F.2d 489, 493 (2d Cir.1992), abuse of defendant by her husband; *United States v. Mickens*, 977 F.2d 69, 73 (2d Cir.1992), retention of crime proceeds, *United States v. Bryser*, 954 F.2d 79, 89 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992). And, in *United States v. Concepcion*, 983 F.2d 369, 385–89 (2d Cir.1992), where the relevant conduct guideline would require an extraordinary increase in sentence by reason of conduct for which the defendant was acquitted by jury, we authorized a downward departure. Indeed, in a number of these cases, we have found it necessary to remand guideline sentences for reconsideration because sentencing judges had failed to appreciate the authority to depart. *See, e.g., Rogers, Califano, Mickens, Cotto,* and *Concepcion, supra.*[8]

### 3. *Adequacy of Guideline Consideration of the Factors that led Judge Martin to Depart*

Merritt contends that because failure to pay restitution and concealment of assets receive consideration in the Manual, a court is barred from upward departure on those grounds.

It is true that the Manual gives some explicit consideration to those issues. For example, in determining the fine range and the actual amount of any fine to be imposed, the sentencing judge is directed to take into account restitution that the defendant has made or that has been ordered.

*See* Manual §§ 5E1.2(c)(1)(B) & (d)(4). An Application Note identifies "voluntary payment of restitution prior to adjudication of guilt" as relevant to a determination whether the defendant should receive a 2–level reduction for Acceptance of Responsibility. Manual § 3E1.1, Application Note 1(b). And, as to concealment of assets, an Application Note to the fine provision suggests that fines be increased or an upward adjustment be imposed for obstruction of justice where a defendant has tried to hide his assets from the court. Manual § 5E1.2, Application Note 6.

We reject Merritt's argument that these provisions marked the limits of sentencing discretion in his case. As noted above, Judge Martin's overall discussion of the issue made clear that the departure was attributable to conduct and characteristics that went well beyond simple "failure to pay voluntary restitution" and "concealment of assets." It is clear that Merritt's profound corruption and dishonesty, and his elaborate fraudulent manipulation—even after his guilty plea—designed to preserve the huge benefits of his crime after service of jail time, are not "of a kind, or to a degree," adequately considered by the scattered guideline provisions and commentaries that Merritt cites.[9] *See United States v. Bryser*, 954 F.2d at 89 ("the Guidelines do not adequately consider defendant[']s ... willing[ness] to exchange time in prison for instant riches upon release"); *see also United States v. Valle*, 929 F.2d 629, 631 (11th Cir.) (per curiam)

---

**8.** Earlier opinions of this court approving of departures include *United States v. Gonzalez*, 945 F.2d 525, 526–27 (2d Cir.1991) (vulnerability in prison); *United States v. Lara*, 905 F.2d 599, 605 (2d Cir.1990) (same); *United States v. Restrepo*, 936 F.2d 661, 667 (2d Cir.1991) (minimal role); *United States v. Joyner*, 924 F.2d 454, 461 (2d Cir.1991) (same); *United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir.1990) (lack of sophistication); *United States v. Ritchey*, 949 F.2d 61, 63 (2d Cir.1991) (single aberrant act); *United States v. Skinner*, 946 F.2d 176, 179–80 (2d Cir.1991) (atypical conduct); *United States v. Garcia*, 926 F.2d 125, 127–28 (2d Cir.1991) (defendant's cooperation conserved judicial resources).

**9.** It is arguable that even for the ordinary case, the Manual does not give adequate consideration to the issue of failure to pay restitution. There is no evidence in the Manual that the Commission believed it had dealt conclusively with this issue and assigned governing values to it. While Chapter 3 does address directly and attach value to a variety of special victim-related adjustments, *e.g.*, "vulnerable" victims (add 2 levels), "official" victims (add 3 levels), victims "physically restrained" (add 2), persons recklessly endangered in course of flight (add 2), no such consideration has been given to failure to pay restitution. It appears merely in commentary as a factor that can be helpful in deciding other issues. The Manual neither vests this factor with any specified value, nor implies that its consideration of the factor has exhausted its significance.

(upward departure to statutory maximum for retention of proceeds in "willful, continuing scheme to profit from their illegal activity"), *cert. denied,* —— U.S. ——, 112 S.Ct. 401, 116 L.Ed.2d 350 (1991).[10]

Both the statute and the Manual make clear that consideration of a factor by the Commission does not bar departure. As the Manual itself states, "the court may depart from the guidelines, even though the reason for the departure is taken into consideration in the guidelines ... if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate." Manual, § 5K2.0 (Policy Statement); *see also* Introduction § 4(b) ("With ... specific exceptions, however, the Commission does not intend to limit the kinds of factors, *whether or not mentioned anywhere else in the guidelines,* that could constitute grounds for departure in an unusual case.") (emphasis added). Professor Freed explains, under the Sentencing Reform Act "judicial review of a guideline's applicability is a matter of paramount importance. Review is not limited to determining whether the Commission merely 'considered'—i.e., mentioned—a subject. Rather, the test focuses on the *adequacy* of the consideration." Freed, *supra,* at 1699.

■ We conclude that Judge Martin departed for reasons of conduct and character that were present of a kind and to a degree not adequately considered by the Sentencing Commission's Guidelines, and that the departure was therefore lawful. 18 U.S.C. § 3553(b).

## B. The Extent of the Departure

Merritt next contends that even if departure was lawful, Judge Martin's upward departure from 37 months to 60 months, equivalent to a five level increase, was beyond his discretionary power.

Merritt contends that his conduct found by Judge Martin was akin to obstruction of justice, and, therefore, like obstruction of justice under Guidelines § 3C1.1, merited at most a two level increase. Merritt contends further that Judge Martin violated the rule of *United States v. Kim,* 896 F.2d 678, 685 (2d Cir.1990), that, in departing upward "the judge should consider the next higher levels in sequence to determine if they adequately reflect the seriousness of the defendant's conduct."

Merritt misconceives the meaning of the *Kim* opinion. As we explained in *United States v. Rodriguez,* 968 F.2d 130, 140 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 140, 121 L.Ed.2d 92 (1992), *Kim* does not require that an offense-level departure be accompanied by a "mechanical level-by-level review of the extent of the upward departure...." Rather, "[t]he point of *Kim* is to use the multi-count analysis and the sentencing table as useful guidance in determining the extent of a departure, not to precipitate a time-consuming analysis of every possible calculation of arguably relevant circumstances." *United States v. Baez,* 944 F.2d 88, 89 (2d Cir.1991). What *Kim* requires is a "careful explanation in the record of the reasons for the extent of the departure." *United States v. Campbell,* 967 F.2d 20, 26 (2d Cir.1992); *see also* 18 U.S.C. § 3553(c). Judge Martin complied with the governing standard.

■ The standard for appellate review of a sentence that departs from the Guidelines is whether such sentence is "unreasonable." By statute, reasonableness is to be judged in the light of "the factors to be considered in imposing a sentence, as set forth in [18 U.S.C. § 3553(a) ] ... and ... the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c)...." 18 U.S.C. § 3742(e)(3); *see United States v. Maier,* 975 F.2d at 949; *accord Williams v. United States,* —— U.S.

---

**10.** In *United States v. Arjoon,* 964 F.2d 167 (2d Cir.1992), we held that the Commission had adequately considered ordinarily restitution prior to adjudication of guilt as a mitigating circumstance warranting a two-point reduction under Section 3E1.1, Application Note 1(b) for acceptance of responsibility. That case has little bearing on the question of whether the Commission adequately considered an out-of-the-ordinary, ongoing scheme fraudulently to retain criminal proceeds as an aggravating factor to be considered at sentencing.

——, ——, 112 S.Ct. 1112, 1121, 117 L.Ed.2d 341 (1992); *United States v. Campbell*, 967 F.2d at 26.

■ We conclude that the upward departure was altogether reasonable. It responded to the sentencing objectives prescribed in 18 U.S.C. § 3553(a). Given the defendant's character discussed above, the departure was necessary "to provide just punishment...." 18 U.S.C. § 3553(a)(2)(A). It was also necessary "to afford adequate [general] deterrence to criminal conduct...." *Id.* § 3553(a)(2)(B). Had the judge not resorted to an extensive upward departure, Merritt would have provided an example of a defendant who beat the system, relying on the Guidelines to limit his jail time while securing lifetime enjoyment of a fraudulently obtained million dollars. *See generally* Freed, *supra*, at 1708–10 (discussing judge's duty to consider purposes of sentencing).

■ As to Merritt's argument that the upward departure should have been limited to two levels because his conduct resembled obstruction of justice, we reject it. The argument rests on a proposition that is well-conceived, but wrongly applied to this case. Merritt is correct that if Judge Martin had departed upward because the defendant's conduct strongly resembled "obstruction of justice" as defined under the Guidelines, although not technically within its ambit, then the departure should have been commensurate with the consequences provided by the Guidelines for obstruction of justice, at least unless good justification is furnished for going further. As we stated in *Rodriguez*, 968 F.2d at 140, "when conduct not taken into account by the Guidelines provisions applicable to the defendant provides the basis for an upward departure, the court should not arrive at a sentence that exceeds the penalty that would have been imposed had the defen-

dant been sentenced under other Guidelines provisions that do take the same or similar conduct into account."

That, however, was not the case. The departure was for reasons of both conduct and character that went far beyond the ordinary "heartland," two-level obstruction. Two additional levels at defendant's adjusted offense level of 19 would have permitted an addition of only 9 months to the defendant's sentence, a plainly inadequate increase given Judge Martin's reasons for the departure, and insufficient to meet the Congressionally enumerated goals of sentencing.[11]

C. The Defendant's Fifth Amendment Privilege

■ Merritt contends that the district court's upward departure violates his Fifth Amendment rights by penalizing him for refusing to incriminate himself by returning the proceeds of his crime. We rejected similar arguments in *Bryser*, 954 F.2d at 89. Merritt points out that, as of the time instantaneously preceding his sentence, notwithstanding his guilty plea to one count, he had not yet been convicted of this offense and remained open to prosecution on it, not to mention 11 open counts which might yet be the subject of prosecution. In support of his contention, Merritt cites *United States v. Stratton*, 820 F.2d 562, 564–65 (2d Cir.1987); *United States v. Bahadar*, 954 F.2d 821, 824 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 149, 121 L.Ed.2d 101 (1992); *United States v. Domenech*, 476 F.2d 1229, 1231 (2d Cir.), *cert. denied,* 414 U.S. 840, 94 S.Ct. 95, 38 L.Ed.2d 77 (1973); and *United States v. Oliveras*, 905 F.2d 623, 628 (2d Cir.1990) (per curiam).

Judge Martin's findings and upward departure involved no infringement of Merritt's Fifth Amendment privilege. In the

---

**11.** Because Judge Martin had ample reasons to justify departure up to the limit of the defendant's statutory sentence exposure, he did not consider other available reasons. We note that the crime of substituting animal feed, unfit for human consumption, in place of milk in shipments intended as famine relief to a starving country, is so heinous and goes so far beyond

the "heartland" of fraud, which prescribed Merritt's offense level, as to justify the conclusion that the nature of Merritt's offense was not adequately considered under the fraud guidelines. In our view, this consideration would have justified upward departure as far as Judge Martin went, or further, had the statute allowed.

first place, Merritt had waived his Fifth Amendment privilege as to information regarding his funds by agreeing, as part of his plea bargain, to disclose all his financial information to the Government and the court.

Second, while production can sometimes involve a selfincriminating act of testimonial character, especially if the production is of some unique object (a murder weapon or a stolen jewel) and the defendant's production demonstrates his knowledge of, an access to, it, the same is not true of restitution payments in these circumstances. Money is fungible. The production of funds for restitution for a crime the defendant acknowledges he participated in does not implicitly acknowledge his possession of the stolen funds, especially when the defendant is a substantial businessman, like Merritt, who could be expected to have access to such a sum from sources other than the crime.

Merritt argues further that Judge Martin must have impermissibly relied on his silence as the basis for concluding that the defendant retained the fraud proceeds. There is no merit to this argument. The Government had presented ample evidence to sustain a finding by a preponderance of the evidence with respect to disputed issues at sentencing. *See United States v. Guerra*, 888 F.2d 247, 251 (2d Cir.1989) (government's burden at sentencing is preponderance of evidence), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). Nor did Judge Martin impermissibly place the burden of proof on the defendant. As Judge Martin clearly stated, it was because the government had proved that the money was in the defendant's hands that the burden of rebutting this evidence fell on the defendant.

### D. The Plea Agreement

■ Finally, Merritt contends that the Government broke its plea agreement with him by advocating an upward departure. Merritt argues that his case is similar to that of *United States v. Corsentino*, 685 F.2d 48 (2d Cir.1982), in which we remanded for resentencing because the Government violated its agreement not to take any position on the defendant's request for a more lenient sentence. We disagree. First, the Government was permitted under the agreement to raise any arguments relevant to the disputes about obstruction of justice and acceptance of responsibility. The facts on which Judge Martin relied related to those issues.

Furthermore, it was Judge Martin, not the Government, who initiated and pursued the issue of upward departure. Judge Martin directed the Government to provide him with the pertinent information. This was clearly within his power, and the Government's compliance with the Judge's direction to provide relevant sentencing information did not involve any violation of its plea agreement. *See United States v. Williamsburg Check Cashing Corp.*, 905 F.2d 25, 28 (2d Cir.1990). The plea agreement expressly recognized that the court could, in any event, consider "any other relevant information." *See* 18 U.S.C. § 3661.

■ Moreover, the Government correctly argues that Merritt himself violated the plea agreement by refusing to make available prior to sentencing "all personal and corporate financial information requested by the Government." A defendant may enforce a plea agreement that induces a guilty plea, *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971); *United States v. Casamento*, 887 F.2d 1141, 1181 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990); however, a defendant who materially breaches a plea agreement may not claim its benefits, *United States v. Nathan*, 476 F.2d 456, 459 (2d Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 171, 38 L.Ed.2d 56 (1973); *see also United States v. Eucker*, 532 F.2d 249, 256 (2d Cir.), *cert. denied*, 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); *United States v. Gogarty*, 533 F.2d 93, 95 (2d Cir.1976).

Here, despite his promise in the plea agreement to turn over his financial information, Merritt repeatedly refused to turn over documentary evidence about disposition of the proceeds, and falsely stated that

the supplier of the milk replacer had been paid. Merritt also lied to the probation officer about the proceeds of the Broadview sale. Merritt breached material terms of the plea agreement, and would therefore have no proper objection even if the Government had gone beyond what the agreement permitted.

## CONCLUSION

We have considered all of Merritt's arguments on this appeal and have found no basis for reversal. The judgment of conviction and the sentence imposed are affirmed.