46 F.3d 1129
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jeffrey Alan WILLIAMS, Defendant-Appellant.
 No. 93-5004.
 United States Court of Appeals, Fourth Circuit.
 Submitted Nov. 23, 1993.
Decided Jan. 27, 1995.
 
 Gregory J. Campbell, CAMPBELL & TURKALY, Charleston, West Virginia, for Appellant. James R. Dedrick, United States Attorney, R. Daniel Boyce, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.
 Before WIDENER and NIEMEYER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Jeffrey Alan Williams appeals the sentence he received after his guilty plea to one count of bank fraud, 18 U.S.C.A. Sec. 1344(1) (West Supp.1993), contending that the district court erred in departing upward by two levels because he had concealed the proceeds of his fraud and thereby impeded restitution. We affirm.
 
 
 2
 Williams, a used car dealer, began a check-kiting scheme in January 1990. In March 1990, his co-defendant, John Douglas Eggleston, became involved, and the scheme continued until January 1991. About $500 million in checks were passed among three accounts controlled by Williams in West Virginia and South Carolina and Eggleston's account at Wachovia Bank in Goldsboro, North Carolina. About $1.8 million was actually withdrawn during the period of the kite. Wachovia Bank suffered a loss in that amount after the kite was discovered,* and this money remained unaccounted for at the time the defendants were scheduled to be sentenced together.
 
 
 3
 At the first hearing, both Williams and Eggleston had the same recommended guideline range of 27-33 months, which had been calculated using $1.8 million as the loss in the offense. However, there was a difference of opinion between their attorneys about the relative culpability of the defendants. Before pronouncing sentence, the district court inquired how the money had been split between Williams and Eggleston. The government had no specific information about what had happened to the missing $1.8 million. The district court then continued the sentencing so that the government could investigate further. It also gave notice that it was considering an upward departure, depending on what it learned about where the money went and whether it was recoverable.
 
 
 4
 At the second sentencing hearing, the government presented the results of further investigation by the Federal Bureau of Investigation. An in-depth analysis had been done of the flow of checks in the kite between May 1, 1990 and December 31, 1990. The period from March 1990 to May 1990 was not analyzed as closely because the banks had a lot of "bad film" in that period, which made many of the checks unreadable. By the beginning of May, a loss to the banks of $1 million had occurred. Between May and December, another $788,364 disappeared, and the total unaccounted for rose to $1.8 million before the kite was discovered in January 1991.
 
 
 5
 Of the $788,364 which disappeared during the analysis period, $403,347 was attributable to withdrawals from Williams' accounts, while $385,018 was withdrawn from Eggleston's account. On March 1, about the time Eggleston became involved in the kite, a loss of $717,601 had already occurred. This whole amount was attributed to Williams, who had been conducting a one-man kite until then. The loss which occurred in March and April, $287,160, could not be definitely attributed to either defendant, so it was apportioned between them using the same percentage as was shown for the May-December period. The loss attributable to Williams over the whole period of the kite was $1,267,994, and the loss attributable to Eggleston was $525,152.
 
 
 6
 After the first sentencing hearing, both defendants were interviewed and took polygraph tests. Asked to explain what happened to the money attributed to him, Williams acknowledged spending about $500,000. Eggleston gave a detailed account of how he had used about $312,600, plus an unknown additional amount on travel. During the polygraph examination, when asked whether he was concealing money or assets, Williams gave answers which were characterized by the tester as distinctly deceptive. Eggleston gave answers which were slightly deceptive, but disclosed after the test that he had sold some cars which were not seized by Wachovia, which the tester felt explained the indication of deception in his case.
 
 
 7
 To Williams' argument that polygraph results were notoriously unreliable, the district court responded that the test only corroborated its belief that Williams was not being truthful about the missing money, and had "done something that's very akin to obstruction of justice." The court said it intended to deny the reduction for acceptance of responsibility which had been recommended in the presentence report, and depart upward by two levels, because it believed Williams had concealed his profits from the fraud and had failed to be forthright with the government. The court invited Williams to provide evidence to the contrary. Williams stated that he was confused about the whole thing and regretful, but provided no other information.
 
 
 8
 The district court then departed upward by two levels, to a guideline range of 41-51 months, and imposed a sentence of fifty-one months. It found that restitution in the amount of $1,842,174 was appropriate, but did not impose restitution because Williams was unable to pay it. The court explained that it had departed because Williams' lack of truthfulness concerning the proceeds of the kite had impeded the recovery of property for payment of restitution. It did not find that Williams had obstructed justice. Finding that Eggleston was less culpable and had been truthful about how he spent the money he acquired through the kite, the court imposed a thirty-month sentence on him.
 
 
 9
 On appeal, Williams contends that the district court erred in departing because of its personal view that the guideline range was too low for an offense involving such a large amount of money; he also argues that there was no evidence to support the court's finding that he impeded recovery of the money. We review departures under the test set out in United States v. Hummer, 916 F.2d 186, 192 (4th Cir.1990), cert. denied, 59 U.S.L.W. 3702 (U.S.1991).
 
 
 10
 Williams correctly points out that the amount of money involved in a bank fraud offense is a factor taken into account by the Sentencing Commission and provided for in the guideline. However, although the court did express dissatisfaction with what it perceived to be relatively low guideline sentences for white-collar crimes, the court did not depart for this reason. Williams' first argument is baseless.
 
 
 11
 Williams concedes that a failure to return stolen goods may be a valid reason for a departure. See United States v. Bryser, 954 F.2d 70 (2d Cir.), cert. denied, 60 U.S.L.W. 3827 (U.S.1992); United States v. Valle, 929 F.2d 629 (11th Cir.), cert. denied, 60 U.S.L.W. 3343 (U.S.1991). A continuing scheme to conceal fraud proceeds and avoid restitution may similarly support a departure. United States v. Merritt, 988 F.2d 1298, 1305-11 (2d Cir.), cert. denied, 61 U.S.L.W. 3818 (U.S.1993).
 
 
 12
 Williams maintains that, in his case, the $1.8 million is only an unsubstantiated claim made by Wachovia, did not actually exist, and therefore could not be returned. Williams did not contest in the district court the information in the presentence report that the offense involved a loss of $1.8 million to Wachovia Bank, or the resulting enhancement of his base offense level. United States Sentencing Commission, Guidelines Manual, Sec. 2F1.1(b)(1)(M) (Nov.1992). He has thus forfeited an argument that there was no loss. United States v. Bornstein, 977 F.2d 112, 115 (4th Cir.1992). Moreover, the government provided evidence that $1.8 million in real money was withdrawn from the bank accounts during the kite, most of it by Williams, who was invited to explain where it went, but did not do so.
 
 
 13
 The court's finding that Williams had been untruthful about the missing money and prevented its use for restitution encompasses a finding that the money was within Williams' control. The finding is not clearly erroneous, given that a preponderance of the evidence showed that it was Williams who removed most of the missing money from the bank accounts. The extent of the two-level departure was not an abuse of discretion. See Merritt, 988 F.2d at 1312 (where defendant's conduct strongly resembled obstruction of justice, departure should be commensurate with guideline penalty for obstruction of justice).
 
 
 14
 The judgment of the district court is therefore affirmed. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.
 
 AFFIRMED
 
 
 *
 Williams initially argued in the district court that he had rendered substantial assistance, in part because he had stopped the kite (after Wachovia discovered it) by stopping payment on several checks he had sent to Eggleston. The government later provided evidence that the only effect of Williams' action was to force Wachovia, rather than one of Williams' banks, to take the loss